**UNITED STATES of America ex rel. Milton RIVERA, Petitioner-Appellant,**

v.

**Charles L. McKENDRICK, as Warden of Wallkill State Prison, Ulster County, New York, Respondent-Appellee.**

**No. 981, Docket 71-1193.**

United States Court of Appeals, Second Circuit.

Argued June 17, 1971.

Decided Aug. 9, 1971.

Timbers, Circuit Judge, filed concurring opinion.

John R. Hupper, New York City (J. Barclay Collins, New York City, on the brief), for petitioner-appellant.

William J. Stutman, New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellee.

Before LUMBARD, KAUFMAN and TIMBERS,* Circuit Judges.

LUMBARD, Circuit Judge:

Milton Rivera, who was convicted in a New York state court in 1965 for rob-

---

* When the case was argued Judge Timbers was a District Judge sitting by designation.

bery and assault, appeals from an order of the Southern District of New York, Edward C. McLean, J., dated June 10, 1970, denying his petition for a writ of habeas corpus. That petition alleged that his conviction, which was based solely on the identification testimony of two victims of the crimes, was obtained in violation of due process of law, because the victims' in-court identification of Rivera was tainted by impermissibly suggestive pre-trial identification procedures used by the police. Since the present record is inadequate for a full consideration of Rivera's claim, we reverse the district court's determination and remand the case for an evidentiary hearing on that claim.

The relevant facts are as follows: During the evening of March 5, 1965, two men, one dark-skinned and the other light-skinned, entered a grocery store in Brooklyn. Vega, an employee, and Vargas, a customer, were inside. The dark-skinned man—later identified as Torres, Rivera's codefendant—held a gun on the two men, while the other took the money out of the cash register. The light-skinned man then grabbed Vega, took his wallet, and shouted to Torres to shoot Vega. Vargas then shouted to Vega not to be afraid, but Torres immediately shot Vargas and in an ensuing struggle Vargas received another shot in the neck. Meanwhile, after the first shot was fired, the light-skinned man dashed from the store; he was not inside for more than three minutes. Torres, too, finally escaped, but he was apprehended several hours later, having left identifying papers in the store. Three days later, the police sent out an alarm for Rivera, although the record does not show the basis for their determination that he was a suspect.

Thereafter, the police showed Vega certain photographs. According to Vega's testimony at trial, Detective Maxwell at one point told him that "he had him [Rivera] and showed me a photograph." Vega also testified that Maxwell "showed me a photograph and I said to him 'Is this the man?'" Apparently on another occasion, Maxwell showed Vega a group of four or five photographs of different men, including one of Rivera, and Vega picked one out. However, because of the New York rule that a witness may not testify as to his prior identification of a defendant by means of photographs,[1] there was no testimony as to whether Vega picked out Rivera's photograph. The record is not clear as to whether Vega was first shown the single photograph or the group of four or five. Similarly, Vargas was shown certain photographs—it is unclear how many—while he was in the hospital recovering from the gunshot wounds, and he was asked whether he would know a person from that group. Pursuant to New York law, there was no testimony as to his response, and none of the photographs shown to either victim was offered in evidence.

On March 17, Rivera's attorney advised the police that Rivera had heard that he was wanted for questioning, and later that day Maxwell arrested Rivera at his attorney's office. Maxwell first took Rivera to the station house, and he then called Vega and instructed him to come to the hospital where he was "going to have someone down for him [Vega] to identify." Maxwell presented Rivera to Vega in the hospital waiting room and asked Vega whether he "knew the guy." Vega said "yes" and Rivera remained silent. Maxwell then took Rivera into Vargas' hospital room, but there was no testimony as to whether Vargas identified him there. Maxwell never took either witness to the police station to identify Rivera in a lineup.

Both Vega and Vargas testified at trial in the Kings County Supreme Court, and both made an in-court identification of Rivera as the light-skinned man in-

---

1. This rule was established by the New York Court of Appeals in People v. Cioffi, 1 N.Y.2d 70, 150 N.Y.S.2d 192, 133 N.E. 2d 703 (1956). See also People v. Giamario, 20 A.D.2d 815, 248 N.Y.S.2d 726 (2d Dept. 1964).

volved in the robbery. Rivera's co-defendant, Torres, on the other hand, while admitting knowing Rivera, testified that Rivera was not with him at any time during the evening of March 5; and a woman friend of Rivera testified that Rivera was with her throughout that evening. Rivera did not testify in his own behalf.

The prosecutor, in summation, stated that both Vega and Vargas had selected Rivera's photograph from several shown to them, and the court in its charge also stated that those witnesses had made such selection. As previously noted, there was no such testimony from any witness at trial.

The jury returned a verdict of guilty against both Rivera and Torres on the crimes of robbery in the first degree, assault in the first and second degree, and possession of a dangerous weapon as a felony. Rivera was sentenced to a prison term of ten to fifteen years on the robbery count and to concurrent lesser terms on the other counts. He is presently serving his term.

Rivera's conviction was affirmed by the Appellate Division, Second Department, which held that while the remarks by the prosecutor and the trial court as to the witnesses' prior photographic identification of Rivera were improper, the errors were harmless. People v. Rivera, 28 A.D.2d 687, 280 N.Y.S.2d 749 (2d Dept. 1967). The New York Court of Appeals similarly affirmed the conviction, but by a 4–3 decision. People v. Rivera, 22 N.Y.2d 453, 293 N.Y.S.2d 271, 239 N.E.2d 873 (1968). The three dissenters felt that the pre-trial identification procedures used here were unnecessarily suggestive and that there was a grave risk that the witnesses' in-court identification of Rivera was based upon those prior identifications, and they therefore felt that the case should be remanded for a hearing on that question. 22 N.Y.2d at 456, 293 N.Y.S.2d 271, 239 N.E.2d 873 (Fuld, C. J., dissenting). The Supreme Court denied certiorari. Rivera v. New York, 395 U.S. 964, 89 S.Ct. 2107, 23 L.Ed.2d 750 (1969).

Rivera filed this petition for habeas corpus on October 21, 1969. The district court denied that petition without holding an evidentiary hearing, finding that the material facts were adequately developed and fully explored in the state court trial and that "[w]hether any more could be elucidated now, some five years later, is highly dubious." The district judge was also satisfied on the merits that the two witnesses' identification of Rivera as the criminal was accurate. By order dated February 19, 1971, we granted Rivera a certificate of probable cause, with leave to appeal *in forma pauperis* and for assignment of counsel.

We agree with Chief Judge Fuld's dissent in the New York Court of Appeals that the pre-trial identification procedures used by the police here were impermissibly suggestive and conducive to mistaken identification. While we cannot say, as a matter of law, that Vega and Vargas would not have been able to identify Rivera at trial without the aid of those previous and impermissible procedures, we believe that it is highly probable that the in-court identification was so tainted. Hence, we must remand the case to the district court for an evidentiary hearing as to whether the witnesses' in-court identification was based on the police's unnecessarily suggestive prior procedures, in which case the use of such testimony would be a denial of due process, or whether the trial identification was independent of those procedures.

■ Since the confrontations in question here occurred two years before the Supreme Court's decision in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the governing principles are those of Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We have previously set forth those principles as follows:

"[T]he required inquiry is two pronged. The first question is whether the initial identification procedure

was 'unnecessarily' [*Stovall*] or 'impermissibly' [*Simmons*] suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been 'unnecessarily' or 'impermissibly' suggestive was so 'conducive to irreparable mistaken identification' [*Stovall*] or had such a tendency 'to give rise to a very substantial likelihood of irreparable misidentification' [*Simmons*] that allowing the witness to make an in-court identification would be a denial of due process."

United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–915 (2 Cir. 1970).

■ Looking to the first part of this two-pronged inquiry, we believe that the pre-trial identification procedures used here were impermissibly suggestive. The police's use of photographs began that suggestiveness. On one occasion, for instance, Vega was shown a single photograph, presumably of Rivera, and he inquired of Maxwell, "Is this the man?" The use of a single photograph is by itself a highly suggestive technique, and Vega's question was hardly that of an eyewitness sure of his identification. The record is not clear as to whether that showing preceded or succeeded the showing of a group of photographs to Vega, nor is it clear as to what was said about the photograph. As to the showing of the group of photographs to both Vega and Vargas, the record does not indicate whether those photographs were all of men who resembled Rivera or whether the photograph of Rivera was in some way emphasized, such as being the only one of a man with the same skin coloring and facial characteristics as the light-skinned man involved in the crime, whom the witnesses had previously described.

Moreover, the record does not show what conversations transpired between Vega and Vargas and the police with respect to these photographs, nor, of course, whether the witnesses identified Rivera from them. These are surely questions to be explored at the evidentiary hearing in determining the extent of the damage done to the in-court identification by these photographic sessions.[2] The one-man show-up at the hospital added to the suggestiveness. The Supreme Court stated in *Stovall* that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U.S. at 302, 87 S.Ct. at 1972. While we have held that such a one-man show-up is not *per se* impermissible [e. g., United States ex rel. Anderson v. Mancusi, 413 F.2d 1012 (2 Cir. 1969); United States ex rel. Phipps v. Follette, *supra*], the circumstances surrounding the show-up here demonstrate an unwarranted influence by the police. Maxwell's statement to Vega that he was "going to have somebody down for [Vega] to identify," and Maxwell's testimony that he had a "talk" with Vargas in his hospital room before Rivera was brought in reinforce that conclusion. Moreover, in the cases cited above, where we have upheld the one-man show-up, the out-of-court identifications were made immediately after the crime occurred and there was no possibly suggestive use of photographs prior to the show-up identification. Here, of course, the hospital confrontations did not take place until twelve days after the crime and prior use of photographs was made. Yet Vega and Vargas were presented with no persons other than Rivera for possible identification in order to test their specific recollection.

2. While evidence as to whether the witnesses identified Rivera by means of a photograph prior to trial was correctly excluded at trial, under the rule of People v. Cioffi, 1 N.Y.2d 70, 150 N.Y.S.2d 192, 133 N.E.2d 703 (1956) (see note 1, *supra*), that rule has no application in an evidentiary hearing at this stage to determine whether trial identification was tainted by prior suggestive action by the police. Indeed, such evidence may be very relevant to Rivera's constitutional claim of a tainted identification at trial.

The Supreme Court did recognize in *Stovall* that one-man show-ups may be necessary when the exigencies of the situation do not permit any other course. Here, however, there was no compelling reason for such man-to-man confrontation. Vega, of course, was uninjured and could easily have been brought to the police station for lineup confrontation. Vargas was recovering and soon to be released, and hence his confrontation of Rivera could have been postponed until he could view a lineup in the station, or at least a lineup could have been held in his hospital room. While we are not holding that an unnecessary lineup, without more, is unnecessarily suggestive, the police's actions under all the circumstances here were impermissibly conducive to false identification and demand that the entire pre-trial identification procedures be carefully scrutinized to determine whether they infected the in-court identifications.

The record is silent as to what Maxwell said to Vargas before Rivera was brought in and as to whether Vargas then identified Rivera as the criminal. It is equally silent as to what Vega meant by his affirmative reply at the hospital to Maxwell's question: "Do you know the guy?" These are questions which might well be answered in an evidentiary hearing.

In sum, the totality of circumstances surrounding the out-of-court confrontations in this case—the photographs and then the one-man show-up twelve days after the crime—lead us to conclude that the pre-trial identification procedures used here were unnecessarily suggestive and conducive to mistaken identification. The next step, then, is to determine whether the witnesses' in-court identification was irreparably tainted by those procedures so as to deny the defendant due process of law.

The Supreme Court warned in United States v. Wade, *supra*, that "[i]t is a matter of common experience that, once a witness has picked out the accused [in pre-trial identification procedures], he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial." 388 U.S. at 229, 87 S.Ct. at 1933: Likewise, the Court stated in Simmons v. United States, *supra*, that "[r]egardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the truthworthiness of subsequent lineup or courtroom identification." 390 U.S. at 383–384, 88 S.Ct. at 971.

The Supreme Court's statements are particularly apt in the circumstances of the instant case. Both Vega and Vargas admitted that Torres' accomplice was a complete stranger to them and that he was in the store less than three minutes. They probably had even less time to observe him, because, for at least a portion of the time, the light-skinned man was busy emptying the cash register and Vega's pocket while Torres stood in front of them with a gun, and because during another portion of the time the witnesses' attention was distracted from the accomplice by the shot at Vargas. The fact that the witnesses saw the criminal for so short a period at the time of the robbery increases their susceptibility to suggestion and thus increases the danger that their in-court identification was based on their pre-trial confrontations.

The impact on the witnesses' memories of the photographic sessions and of the one-man show-up at the hospital was undoubtedly considerable, especially with the police present, and may well have overpowered whatever recollection they previously might have had of Torres' accomplice on the night of the crime. In light of the well-known hazards of identification testimony in any case [see United States v. Fitzpatrick, 437 F.2d 19, 23–25 (2 Cir. 1970); G. Williams, The Proof of Guilt 106–124 (1963)], the

influence of the improper suggestive procedures here is particularly dangerous. In short, there is a very substantial risk that the in-court identification of Rivera by Vega and Vargas was based, not on their recollection of Torres' accomplice himself, but on the hospital identification which in turn was made more suggestive by the prior use of the photographs. If so, that in-court identification was a denial of Rivera's right to due process of law.

Any error that may have been committed was harmful, since the identification of Rivera by Vega and Vargas was the only evidence offered by the prosecution to convict him; and if that evidence was tainted by prior impermissible procedures, the conviction cannot stand. The potential for prejudicial error is increased by the fact that both the prosecutor and the trial judge stated to the jury that Vega and Vargas had testified that they had selected Rivera's photograph out of a group of photographs of several different men. Not only was it error to make such statements to the jury, but in fact there was no testimony to that effect.[3]

For these reasons, we reverse the district court's summary denial of Rivera's petition for habeas corpus; and since, as shown above, we find the present record to be wholly inadequate for us to determine whether the witnesses' in-court identification of Rivera was based on the impermissibly suggestive identification procedures prior to trial, we remand this case to the district court for an evidentiary hearing on that question. The record of the state court proceedings tells us very little about the circumstances surrounding the photographic sessions and the hospital confrontations and almost as little about the witnesses' observation of Torres' accomplice during the robbery itself. Since both sets of factors are highly relevant to the question whether the in-court identification was impermissibly tainted, an evidentiary hearing is essential.

We commend assigned counsel, John R. Hupper, Esq., and J. Barclay Collins, Esq., for their thorough and effective presentation of Rivera's claims.

TIMBERS, Circuit Judge (concurring):

I concur in the Court's judgment of reversal and in Judge Lumbard's lucid opinion in all respects. My only reservation is directed at the practicality of remanding to the District Court for an evidentiary hearing more than six years after the critical events. I agree with Judge McLean's observation more than a year ago that "[W]hether any more could be elucidated now, some five years later, is highly dubious."

Accordingly, I would reverse and remand to the District Court with directions that the writ issue unless the State grants petitioner a new trial within sixty days. That would place the responsibility where it seems to me it rightly belongs, i. e. upon the State authorities, to determine whether petitioner should be released or retried. Chief Judge Fuld, in his dissenting opinion, 22 N.Y.2d at 456, thought that the case should have been remanded to the State trial court for a hearing on the propriety of the pre-trial identification procedures and their bearing upon the in-court identification. I would let the State trial court make that determination, guided by Judge Lumbard's eminently sound opinion.

3. See note 1, *supra*, and accompanying text.