UNITED STATES of America ex rel. Ronald O. BISORDI, Petitioner-Appellant,

v.

J. Edwin LaVALLEE, Superintendent, Clinton Correctional Facility, Dannemora, New York, Respondent-Appellee.

No. 547, Docket 71-2112.

United States Court of Appeals, Second Circuit.

Argued March 7, 1972.

Decided May 1, 1972.

Zachary Shimer, New York City, for petitioner-appellant.

Ilene J. Slater, Asst. Atty. Gen., of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for respondent-appellee.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON, District Judge.*

TIMBERS, Circuit Judge:

The sole issue raised on this appeal from the denial of a state prisoner's petition for a writ of habeas corpus is whether a pre-trial lineup "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [1]

Ronald Bisordi and his co-defendant, James Clark, were convicted on June 21, 1961 in the New York Supreme Court, Bronx County, after a four week jury trial before Justice Abraham D. Levy of first degree robbery, first degree grand larceny, first degree assault, and posses-

---

* Senior District Judge of the District of Montana, sitting by designation.

[1]. Simmons v. United States, 390 U.S. 377, 384 (1968). See also Stovall v. Denno, 388 U.S. 293, 301–02 (1967).

sion of a weapon as a felony in connection with the robbery of a liquor store and the shooting of the store's manager on January 6, 1960.[2] After exhausting his state court remedies,[3] Bisordi filed a petition for a writ of habeas corpus on April 5, 1971 in the District Court for the Southern District of New York. Bisordi alleged that the manager's in-court identification of him as one of the robbers violated his right to due process, as the identification was tainted by an impermissibly suggestive pre-trial lineup. In an opinion dated July 26, 1971, Judge Tyler denied the petition without a hearing.[4] For the reasons stated below, we affirm.

### I.

The evidence adduced at the state court trial[5] established that on the evening of January 6, 1960 two men robbed a liquor store and shot the store's manager, Donald Ogilvie. The two men pretended to be customers. They made several requests of Ogilvie before the actual robbery and the assault. Ogilvie had approximately three minutes to observe them from the time they entered the well lighted store until the time he was shot. Ogilvie testified at trial that he was suspicious of the two men and watched them closely from the moment they entered the store, as one of the men

was white and the store was located in a black neighborhood. Moreover, both men talked briefly during the course of the robbery, and Ogilvie noticed their manner of speaking, particularly that of his assailant, whom Ogilvie subsequently identified as Bisordi.

Before being removed to the hospital and while lying in the store with a bullet in his abdomen, Ogilvie described the two robbers to Officer Paris of the police department. The man who shot him was described by Ogilvie as a brown-skinned male Negro, 23 to 24 years of age, 6 feet tall, 170 pounds, wearing a gray suit and felt hat. Ogilvie testified at trial that he did not recall giving any description to the police on the night of the crime.

Two days after the shooting, Ogilvie gave to the police another description of the robber who had shot him. This time Ogilvie described his assailant as a man about 6 feet tall, 170 pounds, wearing a charcoal gray overcoat and who "looked white" but "sounded like a colored person".

Nine days after the robbery, on January 15, 1960, Detective Carroll called Ogilvie, told him he had picked up two or three suspects and asked Ogilvie to come to the police station to determine whether he could identify "the man that had shot" him.[6] At the station Ogilvie

2. On August 15, 1961, Justice Levy sentenced Bisordi to consecutive and concurrent terms for a minimum of 15 years and a maximum of 40 years.

3. Bisordi's conviction was affirmed without opinion by the Appellate Division, 20 App.Div.2d 625, 245 N.Y.S.2d 979 (1st Dept. 1963); the Court of Appeals denied leave to appeal, 308 N.Y.S.2d 288 (1964); and the Supreme Court denied certiorari, 379 U.S. 863 (1964).

Bisordi's coram nobis petition, apparently challenging the pre-trial lineup, was denied by Justice Ross in the New York Supreme Court, Bronx County, on May 5, 1970. The Appellate Division affirmed without opinion on October 19, 1971. 37 App.Div.2d 922, 324 N.Y.S.2d 1009 (1st Dept. 1971).

4. On August 17, 1971, Judge Tyler granted Bisordi leave to appeal in forma pau-

peris, but denied his motion for a certificate of probable cause. On December 2, 1971, this Court granted Bisordi's motions for a certificate of probable cause and for assignment of counsel.

5. The trial resulting in Bisordi's conviction which is the subject of the instant proceedings was not the first trial. In October 1960, Bisordi and Clark were first tried for their participation in the liquor store robbery. That trial ended in a jury disagreement. The trial with which this petition is concerned began on May 23, 1961 and ended on June 20, 1961. All references in this opinion will be to the trial which resulted in Bisordi's conviction.

6. There is some conflict in the testimony as to what Detective Carroll said to Ogilvie when he requested Ogilvie's presence at the police station. At one point in

looked through a peephole at a lineup consisting of three men: Bisordi, white, 6 feet tall; a Negro, 5 feet, 6 inches tall; and a second Negro, 5 feet, 7 inches tall.[7] Ogilvie immediately identified Bisordi as the man who had shot him.

At the state court trial, Ogilvie identified Bisordi as his assailant. Despite exhaustive cross-examination, Ogilvie remained positively convinced that Bisordi was the gunman. Ogilvie also identified James Clark, Bisordi's co-defendant, as the second participant in the robbery.

■ Ogilvie's in-court identification of Bisordi, while corroborated in part, for all practical purposes was the only evidence offered by the prosecution to connect Bisordi to the robbery and the assault. Thus, if that in-court identification was tainted by an unlawful lineup, the error could not be considered harmless.

## II.

Since the lineup here occurred prior to the Supreme Court's decision in United States v. Wade, 388 U.S. 218 (1967), the controlling standard is that articulated in Stovall v. Denno, 388 U.S. 293 (1967), and in Simmons v. United States, 390 U.S. 377 (1968). As indicated in United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–15 (2 Cir.), cert. denied 400 U.S. 908 (1970), the required inquiry is two-pronged: first, whether the identification procedure was impermissibly suggestive; and second, if it is found to have been so, whether the procedure had such a tendency to give rise to a substantial likelihood of irreparable misidentification that the in-court identification must be excluded. See also United States ex rel. Rivera v. McKendrick, 448

F.2d 30, 32–33 (2 Cir. 1971), cert. denied, 404 U.S. 1025 (1972).

Turning to the first part of this two-pronged test, there are plausible grounds for arguing that the lineup here was impermissibly suggestive. Of the three men in the lineup only Bisordi matched Ogilvie's description in terms of height, and only Bisordi matched the revised description in terms of skin color.

On the other hand, Ogilvie was quite emphatic at the trial in denying that the differences in height had in any way influenced his identification of Bisordi. Moreover, in view of the conflicting descriptions of the assailant's skin color, it was not entirely unreasonable for the police to set up a racially mixed lineup. Furthermore, since we know so little about the other men in the lineup, it is possible that they were light-skinned Negroes and that their skin color did not differ greatly from that of Bisordi. Finally, there is nothing in the record to indicate that the police said anything to Ogilvie which would suggest that Bisordi was more likely to be the culprit. Detective Carroll's statement to Ogilvie that he wanted him to come to the station to see if he could identify the man who shot him seems no more suggestive than the mere fact of having Ogilvie view the lineup.

■ In light of the limited knowledge we have about the other men in the lineup, it is virtually impossible to determine whether the lineup in question was impermissibly suggestive. In such a situation, a remand to the district court for an evidentiary hearing might be said to be appropriate. Such a hearing here, however, undoubtedly would be a futile gesture. The lineup occurred more than

the trial, Ogilvie testified that Carroll said to him, "I've arrested some men. I want you to come down and see if they are the ones that held you up." At another point, Ogilvie said Carroll wanted him to come to the police station to see if he could identify the assailant. For the purposes of this appeal, we shall assume that the latter is the reason Carroll gave to Ogilvie for requesting his presence at the police station.

7. There is some discrepancy in the testimony as to the exact composition of the lineup. Ogilvie recalled two white-appearing persons and one Negro. Detective Carroll recalled two Negroes and Bisordi. As Judge Tyler did, we shall consider the evidence in the light most favorable to Bisordi and treat the lineup as containing two Negroes and Bisordi. Both Ogilvie and Carroll agreed that the other two men were substantially shorter than Bisordi.

12 years ago. All indications are that Ogilvie's and Detective Carroll's memory about the other men would be even dimmer today than at the trial in 1961. We hold that a remand to the district court under the circumstances of this case would serve no useful purpose, see United States ex rel. Rivera v. McKendrick, *supra*, 448 F.2d at 35 (concurring opinion), and in any event is unnecessary in view of our holding below.

### III.

■ Turning to the second part of the two-pronged test referred to above, even if the pre-trial lineup were impermissibly suggestive, we are satisfied that it did not give rise to such a danger of irreparable misidentification that Ogilvie's in-court identification should have been excluded.

■ True, once a witness has identified a person as the result of an unlawful identification procedure, the image from that illegal confrontation is apt to be retained. See United States v. Wade, *supra*, 388 U.S. at 229. However, in determining whether an in-court identification has been irreparably tainted by an impermissibly suggestive lineup, "[t]he effort must be to determine whether, before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor." United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 915.

In the instant case there are several factors which indicate that Ogilvie had such a definite image of his assailant prior to the lineup. First, Ogilvie had three minutes to observe Bisordi at close range in a well lighted store. While Ogilvie also was observing the other robber, these three minutes provided Ogilvie with ample time to fix Bisordi's image in his memory. See United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 916 (30 seconds); United States ex rel. Anderson v. Mancusi, 413

F.2d 1012, 1013 (2 Cir. 1969) (30 seconds). Secondly, Ogilvie was motivated to make a careful observation of the two culprits. As Ogilvie testified at trial, he was suspicious of the two men and watched them closely from the moment they entered the store. See United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 915. A third factor indicating that Ogilvie retained a fixed image of his assailant from the night of the shooting is that Ogilvie immediately identified Bisordi at the lineup and entertained no doubt that Bisordi was the gunman. See United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 915. Fourthly, Ogilvie testified at trial in unmistakable terms that he was basing his in-court identification upon his recollection of the night of the robbery and not on the police station encounter.

It is true that the lineup here occurred nine days after the crime and that the longer the interval between the crime and the confrontation the greater the likelihood that the initial imprint will have dimmed and that the second image will play an important role in the in-court identification. In view of the factors enumerated above, however, indicating that Ogilvie retained a fixed image of the assailant from the night of the robbery, the likelihood that this occurred here was substantially reduced. Moreover, while there would be even more reason to believe that Ogilvie had retained a definite image of the gunman from the liquor store encounter if the lineup had occurred sooner, we have permitted in-court identifications where the interval between the crime and the unlawful confrontation was even greater. See United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2 Cir.), cert. denied, 395 U.S. 983 (1969) (10 days).

Bisordi argues that Ogilvie's giving two conflicting descriptions of the gunman prior to the lineup indicates that Ogilvie retained no definite image of his assailant from the night of the crime. This argument, however, overlooks the fact that Ogilvie gave the first description while lying wounded on the floor of

the store. Under the circumstances, we are not inclined to view this description as reflecting such uncertainty as to require the exclusion of Ogilvie's in-court identification of Bisordi. While Ogilvie apparently was conscious, there was testimony that he was in great pain and was not completely aware of what was going on around him. When Detective Carroll questioned Ogilvie after he had been removed to the hospital, Ogilvie was able to respond only by nods of his head. At trial Ogilvie denied any recollection of ever giving a description to the police at the scene of the crime. Moreover, elements of the description recorded by Officer Paris were shown at the trial not to have come from Ogilvie, but rather from an unidentified person or persons at the liquor store. For example, Officer Paris testified that the fact the assailant was wearing brown shoes was not told to him by Ogilvie. Amid the confusion created by curious bystanders and the 20 police officers at the scene of the crime, it is not inconceivable that other elements of the description also were given by persons other than Ogilvie. Finally, in light of the fact that Ogilvie was absolutely positive two days later that his assailant "looked white" but "sounded like a colored person", we attach little significance to Ogilvie's initial description of the gunman's skin color.[8]

Bisordi also contends that Ogilvie's inability to recollect certain details of the assailant's characteristics and clothing demonstrates that Ogilvie did not have a definite image of the gunman prior to the lineup. In particular, Bisordi points out that Ogilvie could not remember whether Bisordi had a mustache at the time either of the crime or of the lineup, while his arrest photograph showed Bisordi with such a hirsute adornment.

Testimony at trial, however, indicated that it was a thin, "pencil" mustache, and thus it might not have been readily apparent. That Bisordi's mustache was not a striking personal characteristic is borne out by the fact that Detective Carroll likewise was unable to recall whether Bisordi had a mustache at the time of the lineup. It also is true that Ogilvie could not remember whether his assailant was wearing a tie on the night of the robbery. Nevertheless, as with Ogilvie's inability to recall whether the gunman had a mustache, his inability to recollect this relatively minor detail does not reflect such an imprecision in observation as to justify exclusion of Ogilvie's in-court identification.

Bisordi further contends that in other cases where this Court has found due process not to have been violated by an in-court identification preceded by an unlawful identification procedure, there existed indicia of reliability increasing the likelihood of accurate identification which are not present here. In this case, however, there are some factors which corroborate Ogilvie's identification of Bisordi. While Ogilvie's revised description was not as complete as it might have been, it was consistent with his identifying Bisordi as the assailant. See United States ex rel. Valentine v. Zelker, 446 F.2d 857, 859 (2 Cir. 1971). Moreover, Ogilvie's description of the assailant's voice was corroborated by Detective Carroll's testimony about Bisordi's manner of speech. Furthermore, Detective Carroll testified that, at the time of Bisordi's arrest, he was wearing a b'ck leather jacket which matched Ogilvie's description of the jacket worn during the robbery by the second robber. Bisordi admitted to Carroll that the leather jacket belonged to Clark, his co-defendant, and that Clark had his char-

---

8. Bisordi emphasizes that Detective Carroll did not alter the police records to reflect Ogilvie's revised description given two days after the robbery. Appellant appears to stress this point to show that Ogilvie did not actually give a revised description and that Ogilvie and Carroll tailored their testimony to fit Bisordi's features. However, in view of the fact that the store was located in a black neighborhood and that the assailant spoke like a black, Detective Carroll may have continued to believe that the gunman was black, although light-skinned.

coal gray coat which, in terms of color, matched Ogilvie's description of the coat worn by Bisordi during the robbery. In addition, a prosecution witness called to rebut Bisordi's alibi defense [9] testified that she was in the neighborhood of the liquor store with Bisordi and Clark just after the robbery and that Bisordi and Clark exhibited a newly acquired wealth.

Finally, the most important factor negating a claim of unfairness at trial resulting from Ogilvie's identification of Bisordi is that for all practical purposes the sole issue at Bisordi's lengthy trial was Ogilvie's identification of Bisordi and Clark as the participants in the robbery. A substantial portion of the four week trial was devoted to examining the circumstances surrounding Ogilvie's observation of the gunman during the course of the robbery and his identification of Bisordi at the lineup. The danger of Bisordi's conviction being based on misidentification resulting from the lineup was considerably reduced by exhaustive cross-examination which exposed to the jury the potential for error. See Simmons v. United States, *supra*, 390 U.S. at 384. Moreover, the jury deliberated for more than 11 hours before reaching a verdict. Its questions to the trial judge during those deliberations indicate that the jury recognized the importance of Ogilvie's identification of Bisordi and the problems surrounding that identification. Ultimately, the jury concluded beyond a reasonable doubt that Ogilvie correctly identified Bisordi as his assailant. Under these circumstances, were we to reverse the district court's denial of Bisordi's petition for a writ of habeas corpus, we would be substituting our own judgment for that of the state trial judge and jury who saw and heard the witnesses and who were in a better position than we to resolve the identification issue. See United States ex rel. Phipps v. Follette, *supra*,

428 F.2d at 915–16; Clemons v. United States, 408 F.2d 1230, 1241–42 (D.C.Cir. 1968) (en banc), cert. denied, 394 U.S. 964 (1969).

All in all, we are satisfied that Ogilvie's identification of Bisordi as the gunman was correct.

We express our appreciation to Zachary Shimer, Esq., petitioner's court appointed counsel in this Court, for his excellent brief and able oral argument.

Affirmed.

9. While Bisordi did not take the stand, a girl friend, who was also a close friend of Bisordi's family, testified that Bisordi had been with her at her apartment in Mount Vernon, New York, at the time of the robbery. This alibi was sufficiently rebutted by the prosecution witness who testified that Bisordi was in the neighborhood of the store just after the crime occurred.