UNITED STATES ex rel. Carl M. ROB-
INSON, Petitioner-Appellant,

v.

John L. ZELKER, Superintendent, Green Haven Correctional Facility, Stormville, New York, Respondent-Appellee.

No. 814, Docket 72–1224.

United States Court of Appeals,
Second Circuit.

Argued June 16, 1972.

Decided Sept. 28, 1972.

Stephen A. Marshall, New York City, for petitioner-appellant.

Maryellen Weinberg, Asst. Atty. Gen., Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., for respondent-appellee.

Before KAUFMAN, HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is another in a series of recent cases in this circuit[1] involving an in-court identification claimed to have been tainted by suggestive procedures used. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The case is different from some in that the identification witness was himself a police officer. Since Wade and Gilbert have been held by Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), to give a right to counsel ". . . only at or after the time that adversary judicial proceedings have been initiated . . .," this case presents the nice question whether the issuance of a warrant of arrest under former section 144 of the New York Code of Criminal Procedure[2] amounts to such an initia-

---

1. E. g., United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020 (2d Cir., May 1, 1972); United States v. Harrison, 460 F. 2d 270 (2d Cir., Apr. 25, 1972); United States v. Fernandez, 456 F.2d 638 (2d Cir. 1972); United States ex rel. Rivera v. McKendrick, 448 F.2d 30 (2d Cir. 1971), cert. denied, 404 U.S. 1025, 92 S. Ct. 678, 30 L.Ed.2d 675 (1972); United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). Cf. United States v. Madison, 458 F.2d 974 (2d Cir. 1972); United States v. Magnotti, 454 F.2d 1140 (2d Cir. 1972); United States ex rel. Springle v. Follette, 435 F.2d 1380 (2d Cir. 1970), cert. denied, Springle v. Zelker, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331 (1971).

2. Section 144 of the New York Code of Criminal Procedure (as amended in 1967), which was in effect at all times here relevant (the New York Code of Criminal Procedure was repealed and replaced by the New York Criminal Procedure Law in 1971) provided that:

 *A prosecution is commenced,* within the meaning of any provision of this act which limits the time for commencing an action, *when an information is laid before a magistrate charging the commission of a crime and a warrant of arrest is issued by him,* or when an indictment is duly presented by the grand jury in open court, and there received and filed.

 (Emphasis supplied.)

tion. The court below denied without a hearing a pro se application for a writ of habeas corpus under 28 U.S.C. § 2241. Appellant had been convicted in the state court of robbery in the first degree, grand larceny in the third degree, possession of a weapon and assault in the first degree.[3]

A recital of the facts indicates that there is a modicum of doubt whether, without the damaging identification, appellant would have been found guilty. The crime took place in broad daylight in Manhattan at 11:30 a. m. on May 3, 1968. Daniel Greenberg had just obtained a blue airline bag of coins and coin-rolls totalling some $80 from the Manufacturers Hanover Trust Company at 8th Avenue and 44th Street to take to his parking lot on West 46th Street. While walking back to the lot, on the south side of 46th Street, west of 8th Avenue, he was viciously shot in the back by an assailant who picked up the bag with the money. One eyewitness, an engineer named Schumann, saw the assailant hold the gun (which Schumann correctly recognized as a small calibre pistol), grab the bag and run to and enter a white car. Another passerby, Barcelo, observed a white Mercury Cougar stop on a green light at the intersection of 8th Avenue and 46th Street. The usual city horn blowing and "a commotion" on the street followed, and Barcelo then saw a man entering the Cougar, which at that time was stopped on the northeast corner of 8th Avenue across 46th Street. Neither Schumann nor Barcelo identified appellant at the trial.

The witness who did identify appellant was Patrolman Ferdinand Voltaggio. He was an officer assigned to the Parking Enforcement Squad, and at the moment of the crime happened to be located in a tow truck stopped at the 46th Street stop light on 8th Avenue, in the furthest west traffic lane. Voltaggio heard the shot and saw the assailant, then standing over Greenberg's body some 50 feet away, pick up the bag, put the gun in his belt and run toward the tow truck. The assailant ran about 20 feet in front of Voltaggio across 8th Avenue, jumped into the white Cougar, with two men in it, and drove north on 8th Avenue. Voltaggio gave pursuit, the vehicles going through red lights at Broadway and then 7th Avenue after the Cougar turned right on 48th Street. The Cougar became stuck at 6th Avenue in typical mid-day, mid-town, cross-town traffic, and Voltaggio jumped from his truck and started after the assailant who had jumped out of the car. The assailant escaped, but Voltaggio apprehended the two men in the car, the Pyle brothers.

Patrolman Voltaggio testified at trial that he had seen the assailant's face

It is difficult to perceive any basis upon which commencement of a prosecution for the purposes of the statute of limitations is not commencement for other purposes as well, including the commencement of adversary judicial criminal proceedings within Kirby. Kirby states, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, and presumably the dissent in this case would concede, that the filing of an indictment is the initiation of "adversary criminal proceedings." The issuance of a warrant of arrest upon an information is the exact equivalent of the filing of an indictment and, in fact, they are explicitly equated by Section 144. Under New York law, the degree of prosecutorial discretion to proceed to trial under either appears to be equivalent; for example, under the statutes now in effect both can be dropped only with court approval, compare New York Criminal Procedure Law, § 170.40 (McKinney, 1971) with id. § 210.40, and there is every reason to suppose that this has always been the case. Cf. New York Code of Criminal Procedure, § 671 (McKinney, 1958). Under both "a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Kirby, 406 U.S. at 689, 92 S.Ct. at 1882.

3. Appellant was convicted on Feb. 18, 1970, after a jury trial before Justice Frank in the Supreme Court, New York County, and on the robbery count sentenced from 8 years 4 months to 25 years, with concurrent lesser terms on the other counts.

"about 14 seconds" when he was running across 8th Avenue in front of the tow truck (although it should be noted that a man running only 10 miles per hour, half the speed of a sprinter, can run about 15 feet per second), and that he also saw the assailant get out of the Cougar at the 6th Avenue traffic jam, look at the officer and run back down 48th Street toward 8th Avenue.

The car turned out to be a rented Mercury and the airline bag with the money was in it. The glove compartment contained a box of .22 shells and, highly incriminating, a Hertz rental agreement under which the car had been leased to appellant the evening before. Appellant, however, subsequently took the stand on his own behalf to testify that he had signed the rental agreement on behalf of a North Carolina schoolmate and friend of his, one J. B. Ray, at White Plains, with the Pyle brothers present, using Ray's money as a deposit. The purpose of the rental was to enable Ray to travel south, appellant claimed, and after the evening of the rental he had not seen Ray, the Pyle brothers or the white Cougar again.

On the night of the crime, City Detective Horan went to the appellant's house and brought Odessa Chambers, the woman with whom appellant was living and subsequently married, to the station house. There, at a hearing in chambers on an application for a complaint and warrant, Horan, Miss Chambers, and Officer Voltaggio all testified, in the presence of each other.[4]

Detective Horan testified at the arrest hearing as to the events surrounding the robbery and shooting of Greenberg, that he had a description obtained from Patrolman Voltaggio, and that the Pyle brothers who had been apprehended claimed that they rented the car with appellant but did not implicate him in the robbery.[5] Odessa Chambers testified that she had seen the Pyles with appellant the day before, and that he had left the house about 6:30 in the morning.[6] She gave a description of him as being 4 or 5 inches taller than her own 5 feet 2 inches, stating that he was "brown skinned" and when last seen was wearing a black suit with a blue tie and light shirt, black shoes, no hat, but that he could have been wearing a "light colored pair of pants, too." Patrolman Voltaggio then testified about what he had seen and regarding the chase. He gave a description of the robber as "brown skinned, Negro, he was about 5–7 or 5–8, he had a dark jacket and, 1 believe, he had on light pants" and no hat. Upon the strength of the foregoing Judge Bloom directed that a complaint issue charging appellant with the crimes of robbery in the first degree, assault in the first degree and possession of a weapon as a felony.

The evening of the day after the crime Detective Horan went to Port Chester, arrested appellant, and brought him back to the 18th Precinct in Manhattan where he was booked. A few hours later Voltaggio was called to go to the "18th Squad Room." He there

---

4. The hearing minutes apparently were not before the court below when it denied the writ.

5. Neither of the Pyles testified in court. Much of the trial court transcript is taken up with colloquies in which they were going to testify but were warned by the court to engage a lawyer and that anything they might testify to would be held against them. The claim is made on this appeal that the Pyles were intimidated but we put no stock in it; the Supreme Court Judge, Harry B. Frank, was, we believe, properly warning them that they

could be charged with being accessories, and he properly refused to grant immunity.

6. Odessa Chambers Robinson did not testify at the trial, though her testimony at the application for a complaint and warrant did run contrary to appellant's later testimony as to his time of departure, where he said he was going, and whether he kept the car overnight. She did say, however, that "There were four of them. It's not just three," and this to some extent substantiates appellant's own story as to "J. B. Ray."

found Detective Horan and appellant as the only people in the room, conversed with Horan briefly and then told Horan, "Yeh, that's the fellow that did the shooting." No lineup was conducted, nor was any attorney for appellant present at this time.[7]

The first question we have is whether "adversary judicial proceedings" had been "initiated" within Kirby v. Illinois, supra, so as to entitle appellant to counsel under United States v. Wade, supra, and Gilbert v. California, supra, at the "show-up" or confrontation by Officer Voltaggio the night of appellant's arrest. Mr. Justice Stewart, speaking for a plurality of four Justices in Kirby, made it clear that the right to counsel accrues ". . . at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." 406 U.S. at 689, 92 S.Ct. at 1882. The Chief Justice, concurring both in the plurality opinion and separately, agreed "that the right to counsel attaches as soon as criminal charges are formally made against an accused and he becomes the subject of a 'criminal prosecution.'" 406 U.S. at 691, 92 S.Ct. at 1883.

 Here the arrest warrant itself commanded that appellant be brought forthwith before the Criminal Court "to answer the said charge, and to be dealt with according to law." These were formal criminal proceedings, for the warrant had been signed by a judge based on an "information upon oath" that appellant did commit the crimes of assault, robbery and possession of a dangerous weapon. This being true, Wade required counsel at the show-up, for we

see no distinction based on the chance fact that the identifying witness was also a police officer. Time was not of the essence, a lineup could have been arranged and there appeared to be no "substantial countervailing policy considerations" against requiring the presence of counsel as suggested in Wade. 388 U.S. at 237, 87 S.Ct. 1926; see United States ex rel. Cummings v. Zelker, 455 F.2d 714, 716 (2d Cir. 1972). Advice to appellant about his rights at the time of his arrest does not suffice. United States v. Ayers, 426 F.2d 524, 527 (2d Cir.), cert. denied, 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970). Moreover, there is a question whether the show-up was "unnecessarily suggestive and conducive to irreparable mistaken identification" within Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); see United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). But see United States ex rel. Anderson v. Mancusi, 413 F.2d 1012 (2d Cir. 1969) (one man show-up not per se impermissible). In view of the Wade violation, however, we need not pass upon this question here.[8]

The principal question then is whether Officer Voltaggio's identification had an independent source, that is, was based upon ". . . observations of the suspect other than the [show-up] identification." United States v. Wade, supra 388 U.S. at 240, 87 S.Ct. at 1939. There is substantial evidence in the record that the in-court identification was independent of the show-up in origin—the witness's original opportunity for observation in terms of visibility conditions was

7. Appellant's version of what happened in the squad room differs from Voltaggio's. Appellant claims that he was interrogated and singly displayed before a one-way mirror by the police, that he requested to see and talk with an attorney but was told that he could have one only after he told the police what they wanted to know, and that it took two trips before the mirror before Police Officer Voltaggio entered the room. Officer Voltaggio was present

at the arraignment on the following day, March 5, and testified at trial that he was shown a single photograph of appellant by Detective Horan who stated that it was a photograph of Robinson, apparently at the arraignment.

8. Nor need we pass on the Gilbert point, that testimony as to pretrial identification made under a Wade violation is in and of itself to be excluded.

excellent, in terms of distance good and in terms of time ample, if the officer's testimony is taken at face value. *See* United States ex rel. Cummings v. Zelker, *supra*; United States ex rel. Phipps v. Follette, *supra*, 428 F.2d at 915. There was also a relatively short interval—36 hours—between the original event and the questioned confrontation at the squad room, thereby lessening the likelihood that the initial imprint will have dimmed and the second image be the one relied upon for the in-court identification. *See* United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020 (2d Cir., May 1, 1972).

On the other hand, Voltaggio's initial opportunity for observation was probably not so longlasting as the 13, 14 or 15 seconds to which he testified or the 17 seconds to which the State alludes in its brief, since the assailant was running and in but 4 seconds at a moderate speed[9] rather readily could have passed the tow truck parked on the west side of the avenue; by Voltaggio's testimony the assailant was some 25 feet away at that time, and Voltaggio's attention was also attracted to the Cougar on the other side of the avenue by the horn blowing. And on the second occasion, the view at the traffic jam when the assailant jumped out of the Cougar, the officer first said his view was 2–3 seconds, and later, when the judge said, "He said in 3 seconds," said "3 seconds."[10] Moreover, his descriptions at the time of the arrest hearing and at the time of trial differ from one another: while the former description included "brown skinned" and "light pants," but no mention of hair

style or moustache, the latter read "light skinned," "dark pants," an "Afro haircut" with "a part in it," and a "pencil striped moustache." Schumann, the engineer, who saw the event and it will be recalled did not identify appellant as the assailant, testified that the assailant's hair was "neat" and that he had on dark pants.

The issue of taint is not made less difficult when it is realized that before Officer Voltaggio made his show-up identification he heard Odessa Chambers' description of the witness and Detective Horan's statement that Chambers' and Voltaggio's descriptions at the arrest hearing "[match] well with the one Hertz gave us." That there was a degree of uncertainty about the officer's identification would seem to follow from appellant's version of the "show-up," if believed, *viz.*, that he had to appear twice before a one-way mirror before Voltaggio appeared. It also follows to some extent from the fact that Detective Horan at some time, apparently at the arraignment, showed Voltaggio a photograph—the necessity for which does not appear.

Suffice it to say that there is evidence in the record that would justify a finding either way on the issue of "independent source," but it will be recalled that the State had the burden of proof by "clear and convincing" evidence under *Wade*, 388 U.S. at 240, 87 S.Ct. 1926; *see* United States ex rel. Cummings v. Zelker, *supra*, 455 F.2d at 716–717. Thus we are required under United States ex rel. Rivera v. McKendrick, 448 F.2d 30 (2d Cir. 1971), cert. denied,

---

9. Voltaggio, who is 5 feet 8 inches in height and weighed 225 pounds, testified he did not chase the assailant because "I felt he was a little faster than me in running . . . ." On redirect the prosecutor asked him whether he was a "track man or runner of any kind," to which an objection was sustained after a negative answer.

10. Voltaggio's testimony is somewhat self-contradictory. On the one hand he testified that at the traffic jam at 6th Avenue the assailant ran toward 8th Avenue and thus *westerly*, so as to pass Voltaggio. Indeed, the trial judge subsequently inquired whether the assailant was 20 feet away "when he passed you" and received an affirmative answer. Subsequently on cross, however, he testified that the assailant ran *easterly*. We put no emphasis on this at all, however, since his original reference to 8th Avenue probably was a typical simple mistake of a witness and his failure to correct the judge on the inquiry inadvertent.

404 U.S. 1025, 92 S.Ct. 678, 30 L.Ed.2d 675 (1972), to reverse for an evidentiary hearing on the question whether there was impermissible taint to the in-court identification—unless we were to conclude that any error was harmless in any event within Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

█ It is true that appellant rented the car used in the crime and that the jury disbelieved his alibi story about renting it for "J. B. Ray." From the transcript the trial judge evidently disbelieved appellant on the basis of Odessa Chambers' testimony at the pre-arrest hearing,[11] but it will be recalled she, there, spoke of a fourth man— "There were four of them. It's not just three." It hardly follows inexorably from the fact that the car was rented by appellant, however, that he was the assailant.[12] He would have to have been pretty stupid, as his counsel argued in closing, to have left the rental agreement with his name and address in the glove compartment of a white Cougar to be used as the getaway car in a daylight robbery.[13] Moreover, the trial judge indicated to the jury three times that the witness Schumann had identified appellant as Greenberg's assailant, correcting himself twice but not the third time. Cf. United States ex rel. Rivera v. McKendrick, supra, 448 F.2d at 35 ("potential for prejudicial error" increased by

prosecutor's and judge's statements, absent evidence, of selection by witnesses of defendant's photograph out of a group of photographs). With Voltaggio's identification the sole identification tying appellant to the crime, and especially in the light of Schumann's omission to make an identification despite close-up observation and a detailed description, we cannot say that any error in respect to the identification evidence was harmless.

Accordingly we reverse and remand for an evidentiary hearing by the court below on the question of independent source, in accordance with *Wade* and its requirements. 388 U.S. at 240, 87 S.Ct. 1926.

Reversed and remanded.

HAYS, Circuit Judge (dissenting):

I cannot agree with the majority's conclusion that "adversary judicial criminal proceedings," within the meaning of Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), had been begun in this case at the time of the pre-trial show-up, entitling Robinson to counsel at that show-up in accordance with United States v. Wade, 388 U.S. 263, 87 S.Ct. 1926 (1967). In *Kirby* the Court said:

"The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. *For it is only then that the Government has committed itself*

11. The Court:

. . . . .

In any event, she did testify and you showed me her testimony.

This testimony was given prior to any legal status of his wife so she no longer can claim that her lips are sealed because she is his wife.

I believe that the testimony that she can offer clearly indicates that everything this defendant has stated on the stand is absolutely perjurious and concocted—thus I will call that.

I think she is a necessary witness for the prosecution and I direct you to have

your detective bring her in here tomorrow as a witness.

12. Cf. United States v. Garrett, 371 F.2d 296, 299 (7th Cir. 1966) (defendant Andrews), modified sub nom. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

13. On the other hand, "Ray" (and, perhaps, the Pyle brothers) would have had every reason to attempt to cast suspicion upon appellant by leaving the rental agreement with his name on it in the getaway car.

*to prosecute, and only then that the adverse positions of Government and defendant have solidified.* It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." (Footnote omitted; emphasis added.)

Kirby v. Illinois, *supra,* 406 U.S. at 689, 92 S.Ct. at 1882.

Here the only judicial action taken against Robinson was the issuance of a warrant of arrest. He was not even arraigned until the day after the show-up. The majority, in its footnote 2, cites former N.Y.Code Crim.Proc. 144 for the proposition that the warrant commenced the prosecution within the meaning of Kirby v. Illinois. However, that section says only that "[a] prosecution is commenced, *within the meaning of any provision of this act which limits the time for commencing an action, . . .*" when a warrant is issued. It seems clear that such a warrant is not a point at which "the Government has committed itself to prosecute, and . . . the adverse positions of Government and defendant have solidified."

Though the majority does not reach the point because of its disposition of the case, I do not see any need, on the facts of this case, to hold a hearing on the question of whether the identification procedures used were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [Robinson] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). See United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); United States ex rel. Anderson v. Mancusi, 413 F.2d 1012 (2d Cir. 1969). Nor do I see any merit in the other points raised by appellant.