**Charles E. HORNER, Petitioner,**

v.

**STATE OF FLORIDA, Respondent.**

**Civ. No. 64-347.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Oct. 6, 1967.

See also 5 Cir., 398 F.2d 880.

## ORDER

WILLIAM A. McRAE, District Judge.

Pursuant to this Court's Order, two evidentiary hearings were held on the issue of whether or not Petitioner was denied due process under the Fourteenth Amendment of the Constitution of the United States in a trial on a charge of extortion held in the Criminal Court of Record of Dade County, Florida (Falk, J.) on April 23–25, 1962. Petitioner has presented in support of the petition for writ of habeas corpus the testimony of witnesses, affidavits, transcripts of previous depositions and trials, transcripts of bar association investigations and

certain pre-trial statements and grand jury proceedings in which the Petitioner and the prosecutor were involved. The State has introduced the testimony of Alfonso Sepe, the principal prosecutor, in the extortion trial.

## FINDINGS OF FACT

1. The Petitioner ("Horner") was found guilty by the State Court of threatening a state witness ("Dew") who was allegedly to testify against Petitioner in the Criminal Court of Record in Dade County. Horner, his wife and a number of others, including Dienger and Shapiro, had been named as codefendants in seven grand larceny cases which were filed in March and April, 1961.

2. In May, 1961, all ten defendants in the larceny trials pleaded not guilty at their arraignment. The cases were scheduled for trial in October 1961, but the State requested a continuance in order to have additional time to study the abstract of title to real property owned by certain of the defendants. The State's theory was that the defendants had traded mortgages on portions of this realty to individuals in the Miami area in exchange for automobiles. The State contended that the title to the property was so confused as to render the property and the mortgages thereon worthless.

3. One of the trial prosecutors, Robert Metzker, had formerly been associated in the real estate business with Horner, had shared offices with Horner and had represented Horner as legal counsel in real estate and mortgage transactions. The larceny cases against Horner were originally assigned to a different division of the trial court to which neither Sepe nor Metzker was assigned as prosecutors. On Sepe's motion, without knowledge of the defense, the Horner cases were assigned to Judge Falk's division in which Sepe and Metzker acted as prosecutors. Under the rules of the Criminal Court of Record all these larceny cases, together with the subsequent extortion case, would normally have been assigned to the division in which the first case was filed, which was not Judge Falk's division.

4. During April, 1961, the State contacted Dienger and Shapiro and certain other defendants and persuaded them to plead guilty and to testify against Horner and the other defendants. The State assured Dienger and Shapiro that, on sentencing, the judge would be advised of the extent of their cooperation and that the State would not have been able to tie-in and convict Horner and another defendant, Beecham, without their cooperation. Sepe indicated to Dienger and Shapiro that other criminal charges then pending against them would not be prosecuted if they testified against Horner. The investigator for the State advised Dienger and Shapiro that they would not go to jail if they cooperated in convicting Horner.

5. In preparing for the grand larceny trials, Sepe instructed Dienger and Shapiro to prepare a summary of the persons to whom they had traded mortgages for cars ("Yellow Sheet") and of the names of the defendants who had dealt with such persons and other relevant information. Dew's name was also listed on the Yellow Sheet, but the Yellow Sheet shows that neither Dienger nor Shapiro had any contact with Dew. Sepe admitted that he "studied" this Yellow Sheet prior to the extortion trial. Horner had actually purchased a boat from Dew in October, 1960, and Horner did not meet Dienger and Shapiro until December, 1960. In March, 1961, Dew had gone to the State Attorney's Office, after seeing newspaper publicity concerning the arrest of Horner, Dienger and Shapiro and others on the larceny charges, and attempted to have Horner prosecuted on an argument over his boat transaction with Horner. Dew had told Horner that he would go to the State Attorney's Office and file charges against Horner if Horner did not make good a post-dated check which Horner had given Dew in payment for the boat. The State did not file a charge in connection with the boat transaction involving Dew and Horner.

6. One year later, in March of 1962, Dew again went to the State Attorney's Office. According to Dew, Horner had telephoned him and stated that if he (Dew) testified in the larceny trial, Horner would tell Dew's employer that Dew was a homosexual. This charge, by Dew, was the basis of the extortion trial and the conviction of Horner. Horner admitted that he told Dew's employer (City of Miami Beach) that Dew was a homosexual, but Horner denied any knowledge of Dew being a witness in the larceny cases.

7. In its Order to Show Cause, filed June 10, 1965, this Court initially considered a single issue: "Whether or not the prosecuting officials in the State Attorney's Office of Dade County, Florida, knowingly used perjured testimony to convict the Petitioner." The specific perjury alleged in the original petition consisted of the statement "These were the three men I had dealt with all along." This statement was made by Dew during the extortion trial in response to a question by the prosecution. The Petitioner contended that the "all along" statement was an interjection by the witness which the prosecution knew to be untrue. The Petitioner contends that, although he had some business dealings with Dienger and Shapiro which resulted in the arrest of all three on grand larceny charges, his transactions with Dew were unrelated to these business dealings and that he had had no transactions "all along" with Dew which involved Dienger and Shapiro. Mr. Sepe, the prosecutor for the State, admitted that Dienger and Shapiro did not know the Petitioner at the time Petitioner's transaction with Dew took place and that approximately two months after the Dew-Horner transaction occurred, Dienger and Shapiro first met Horner.

8. The Yellow Sheet indicates that the State had pre-trial knowledge that Dienger and Shapiro did not have any dealings "all along" with Dew. A pre-trial statement, obtained by the prosecution from Dew, also shows that the State knew that only Horner and Dew were involved in the initial boat transaction. In another pre-trial statement to the prosecution, Dew advised the prosecutor that Horner was never present at any conversation which he subsequently had with Dienger and Shapiro. The testimony of Dienger before this Court on September 13, 1965, also confirms the Petitioner's version of his transaction with Dew.

9. The record of the extortion trial shows that the prosecution, over the standing objection of counsel for the Petitioner, repeatedly and intentionally made good use of Dew's "all along" statement by connecting the Petitioner with Dienger and Shapiro. The State introduced testimony that Dienger, Shapiro and the Petitioner were charged in the grand larceny proceedings and extensive testimony was introduced concerning the nature of the alleged grand larceny scheme. Sepe had the extortion jurors know the year, make, model and color of the automobile allegedly stolen by Dienger, Shapiro and Horner in the larceny cases. Although the closing argument of the prosecution disclaims any intention to convict the Petitioner in the extortion trial for the alleged criminal act involved in the larceny charges, it is clear that the State placed heavy emphasis on this "all along" criminal association.

10. It is clear that the State tried to prove during the extortion trial the alleged criminal association of the petitioner with the other defendants in the pending larceny trials. It is also clear that the prosecution knew that the transaction referred to by Dew's "all along" statement were unrelated to the acts of Petitioner, Dienger and Shapiro as a group.

11. In his testimony before this Court at the initial evidentiary hearing, Sepe could not recall any evidence of a series of transactions between Horner, Dew, Dienger and Shapiro and stated he would have to "refresh his memory" before stating whether or not there was any other evidence of a course of deal-

ings between all four parties, but at the second evidentiary hearing, neither Sepe nor any other state witness appeared. At the time of the second hearing Sepe was employed by the State as an Assistant State Attorney.

12. During the extortion trial Sepe repeatedly referred to the property owned by Horner and others as "worthless". There was no evidence in the record of the extortion trial as to the value of this property.

13. In his closing argument Sepe injected "Al Capone" into the extortion trial and suggested to the jury that the intimidation of Dew by Horner was more refined but just as effective. In his final words to the jury, Sepe also advised that he had personal knowledge that Dew was actually "not a queer or a homosexual". There was no evidence in the record as to Dew's homosexuality.

14. Sepe also characterized the defense attorney as "an expert in the rackets."

15. No pre-sentence investigation was made by the trial judge before passing a ten-year maximum sentence on Horner on the extortion charge. The prosecutor advised the trial judge, however, that he had voluminous records concerning Horner's embezzlements and fake employment agencies. No such records were produced in discovery proceedings in this Court.

16. In this Court, Sepe testified that Horner's mortgage brokers license had been revoked and that he had been convicted in the City of Coral Gables. The evidence introduced by Petitioner shows that such testimony by Sepe was without foundation. No evidence to the contrary was introduced by the State.

17. The record of the extortion and grand larceny trials and the testimony before this Court show that the prosecutor demonstrated a lack of impartiality towards Horner throughout. In Sepe's own words, "It isn't viciousness that you see from the prosecutor here. What it is, is venom, for this reason. I represent the law. * * *"

18. Sepe, in his closing argument in the extortion trial, emphasized the pending trials of Horner, his wife, and Dienger and Shapiro on the grand larceny counts. Horner's conviction on the first grand larceny charges was subsequently set aside in a coram nobis proceeding wherein the Petitioner alleged that the State knowingly used perjured testimony because the trial prosecutors had failed to disclose the leniency and deals promised to the defendants who testified for the State. The remaining grand larceny cases against Horner were subsequently dismissed for lack of prosecution.

## CONCLUSIONS OF LAW

1. In the trial of Horner on the extortion charge, the State failed to correct a material false statement made by one of its witnesses. The statements obtained by the State and the testimony of the prosecutor show that there was, in fact, no "all along" association of the Petitioner and the other parties referred to by their witnesses and that the prosecutor knew no such association existed. Because of the heavy emphasis given by the State to the grand larceny charges then pending against these codefendants, the failure of the State to correct this false statement of its witness created fatal error. Due process requires that the State not only avoid use of false testimony but also that it correct any false testimony which is volunteered by its witnesses and which is known to be false by the State.

2. The total conduct of the trial of the Petitioner and of his sentencing was so infected with the self-acknowledged "venom" of the prosecutor as to deprive Petitioner of a fair trial. The introduction of testimony concerning unrelated crimes, the use of a prosecutor who had formerly acted as attorney for the Petitioner, the reference to Al Capone tactics of intimidation, the statements of the prosecutor concerning facts not in the record, the heavy sentence imposed without presentence investigation on the basis of unsupported charges by the prosecutor, individually constitute

indicia of an unfair trial. Taken together, these factors overwhelmingly show that Petitioner was deprived of the fair and impartial trial required by due process of law.

3. The obvious contradictions and conflicts in the testimony of Sepe before this Court, when compared with other testimony in previous hearings and depositions, seriously impair his credibility. His failure to appear and testify at the second evidentiary hearing raises the presumption that his testimony would have been adverse to his employer, the State. Therefore, it is upon consideration ordered that:

1. Petitioner may be detained in Respondent's custody in the Duval County Jail for a period of ten (10) days from the date of this Order.

2. Upon the expiration of said period, Petitioner shall stand released and discharged from further custody unless the State has elected to grant Petitioner a new trial.

3. In the event of an appeal from this Order, Petitioner shall be released from the custody of Respondent on his own recognizance.