Harold **HARRIS**, Plaintiff-Appellee,

v.

John **TURNER**, Warden of the Utah State Prison, Defendant-Appellant.

No. 72–1300.

United States Court of Appeals, Tenth Circuit.

Sept. 21, 1972.

H. Don Sharp, Ogden, Utah, for plaintiff-appellee.

David R. Irvine, Asst. Atty. Gen., State of Utah (Vernon B. Romney, Atty. Gen., and David S. Young, Chief Asst. Atty. Gen., State of Utah, on the brief), for defendant-appellant.

Before PHILLIPS, SETH and Mc-WILLIAMS, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Harris was charged with and tried and found guilty of the offenses of rape, robbery, and second degree kidnapping

in the District Court of Weber County, Utah. Judgments of conviction were entered and sentences imposed, which were affirmed by the Supreme Court of Utah.

The person against whom such offenses were alleged to have been committed was Kathleen Edwards.

About 7 a. m. on December 29, 1970, the police force of Roy, Utah, arrested Harris and Richard Burney at the Travelodge Motel in Ogden, Utah. About 8:-30 a. m. of that day, and before Harris had been charged with such offenses by complaint or other formal charge, the police conducted a lineup of seven persons, including Harris, who was No. 3, and Burney, who was No. 6. We will refer to the police lineup more fully in our statement of facts.

Harris filed an application for a writ of habeas corpus in the United States District Court for the District of Utah, Central Division, predicated on the alleged grounds that he was not provided with counsel by the state at the time the lineup was conducted, and that the lineup was improper in that it was unduly suggestive of his identity. He raised those questions in a motion to suppress that he asserted was evidence of his identification by Miss Edwards at the preliminary hearing and at his trial. We will later show she did not identify him, in the ordinary sense of the term "identify," either at the preliminary hearing or the trial. The state court accorded him a full and fair hearing and denied his motion. He also filed an application for a writ of habeas corpus in the state court, which was denied without a hearing.

Chief Judge Ritter, of the United States District Court for the District of Utah, granted the writ and discharged Harris from custody. The Warden has appealed.

Chief Judge Ritter made the following findings of fact and conclusions of law:

## "FINDINGS OF FACT

"1. This matter is properly before this Court.

"2. That the plaintiff was not properly advised of his right to have counsel present at the line-up held immediately after his arrest.

"3. That the plaintiff did not effectively waive his right to counsel at said line-up.

"Based on the foregoing Findings of Fact, the Court hereby makes the following:

## "CONCLUSIONS OF LAW

"1. This Court has jurisdiction over the parties to this action.

"2. The plaintiff was denied his Constitutional rights under the Sixth Amendment to the United States Constitution, to wit at the line-up held immediately after plaintiff's arrest.

"3. Based on the denial of plaintiff's Constitutional rights at a critical stage of the proceedings against him, he should be released from custody forthwith."

Except with respect to the issue as to whether Harris waived his right to counsel during the lineup, the facts are not in dispute. We do not go into the question of such alleged waiver, for reasons we shall hereinafter state.

On December 28, 1970, Miss Edwards was enlisted in the United States Air Force. On that date, she was on leave at Ogden, Utah, her home. Her father and mother lived in Ogden, but at separate addresses. On that date, she was staying with her father. She drove her father's car to her mother's home and she and her mother attended an early "show." They returned to her mother's home, and Miss Edwards then drove in her father's car to visit a friend, arriving at the latter's home about 10 p. m. She left about 1:30 a. m., intending to call upon a friend, Paul Silvassy, with whom she had become acquainted when they were both in the Air Force. He had been discharged and was living in Roy, Utah, a city adjacent to Ogden, Utah. She proceeded down the Riverdale Road, which led to Roy. As she proceeded along such road, a car passed her, pulled

off to the side of the road, and stopped in front of her uncle's furniture store. She noted it was an old white Thunderbird Ford. After she passed it, its lights were turned off and then on and it began to follow her. When she reached the intersection of Riverdale Road and the main street of Roy, she stopped in the right lane for a red light. The Thunderbird pulled up in the left lane, at the rear of her car, and a man got out of the Thunderbird, came up to her window, pointed a pistol at her, and told her to open her front door. Her front door was stuck and she unlocked her left rear door. The man had on dark sun glasses. He got into the back seat, climbed over into the front seat, and told her to drive ahead and pull off at the first side road. She said to him, "Please don't hurt me." He replied for her not "to give him any business" and he would not hurt her. She proceeded to drive ahead, not down a side road. He kept shouting at her to turn off at a side road, and at one time put the pistol to her head, and appeared to be angry when she did not turn off. She then drove through two red lights and made a right turn. They were then in a residential area of Roy. The man told her to pull off to the side of the street and stop, and said she could keep her keys in her purse. She told the man she had a $50 bill in her purse and she would give it to him if he would leave her alone. He did not take the bill, but later told her to give it to him and she did. He blindfolded her and took her out the right door of her car and around to the rear of the Thunderbird, had her get in the rear seat, and got in that seat with her. He told the driver of the Thunderbird to drive straight to the house. The driver appeared to be nervous, and the man in the rear seat changed to the front seat and made her lie down on the back seat. After driving some distance further, they turned in to what she thought was a house. One of the men said, "Wait a minute and see if the neighbors are looking." They then told her to get out of the back seat of the Thunderbird. She took two steps upward. Her second step was on a rug. One of the men told her she was in a living room and they had her sit down on what she thought was a couch. They removed all her clothing. They then laid her down on what she had thought was a couch, and which turned out to be a bed. They both took off all their clothes and each one of them raped her two times. The room had two beds. One of the men raped her on one of the beds twice and the other one on the other bed twice. She did not resist, because she was in great fear that they would severely injure her if she resisted. Before raping her, they made her engage in unnatural and perverted relations which are too sordid to relate. Fortunately, we do not have to relate them. When they had satisfied their lust, they told her she could go in the bathroom, remove the blindfold, and dress, and then to replace the blindfold. When they handed her clothing to her, they failed to include her blouse. The bathroom door opened outward into the other room, and one of the men handed her the blouse through the partly open bathroom door. She stated she got a good view of the right side of the man's face, the upper part of his body, his hair, his right sideburn, the texture of his skin, and part of his shirt and jacket, particularly the sleeve of the latter, which was intruded into the open door when he handed her the blouse.

Of course she had a good opportunity to observe the features, clothing, hair and voice of the other man, who was Richard Burney, before he blindfolded her. And she said one thing that distinguished Burney from the other man was that Burney's voice was quite coarse and rough, and the voice of the other man, who handed her the blouse, was normal and natural.

In describing what she saw, she said his hair was long and brushed back and was dark brown in color; that his sideburn extended below the lobe of his ear; that his shirt was solid gold in color and had a large collar. She further said that she saw the arm of his coat when he handed the blouse to her; that it was

a brown suede coat with a rough finish, and that Burney wore a brown coat with a smooth finish.

Miss Edwards dressed and replaced the blindfold and came out of the bathroom. The man with the suede coat led her to the Thunderbird and had her lie down on the back seat. She felt the rough suede coat when he led her. The blindfold was loose enough so when she looked straight down she could see the upholstering in the Thunderbird, and she noted that it was white. She observed that clothes were hanging on the left side of the rear seat; that a sweater was hanging on the left front seat of the Thunderbird, which was a bucket seat, and that there were bottles and other junk on the floor in front of the rear seat.

The men told her they would take her to her car. One of them told her when they stopped to wait and keep down, because they wanted to wipe the fingerprints off of her car. They then drove to about a half block from her car and stopped again. The man on the passenger side of the front seats of the Thunderbird took her to the rear of the Thunderbird and told her to walk straight ahead and not to look back or she would get her head blown off. He then removed the blindfold and she walked straight ahead to her car.

She entered her car, drove about two blocks, and found a Conoco filling station which was open. She asked the attendant to call the police. David Bishop, a Roy police officer who was on the night shift, answered the call. He received it about 3:45 a. m. He went to the Conoco station and had a conversation with her. She gave him a paper, which was a sanitary toilet seat cover that she had removed from the toilet seat and put in her purse while she was in the bathroom. It had a picture of a bear on it, which was the emblem of the Travelodge Motel, and enabled the police officers to identify the motel where the rapes were committed. After talking to Miss Edwards, Bishop took her to the Roy Police Station. There she talked to a detective of the Roy police force. He called the Ogden

Police Department. The Roy police then took her to the Ogden Police Department. The Travelodge Motel was located in Ogden.

Miss Edwards's father was at the Ogden Police Station and had reported her as missing.

The police officers then took Miss Edwards to the Travelodge Motel. They located a white Thunderbird in a parking lot area adjacent to the motel. They then took her to the Thunderbird in the parking lot. By its general appearance, the articles that were hanging on the rear seat, and the bottles and junk that were on the floor, she was able to identify it as the car in which she was taken to the motel and in which she was returned to her car.

After locating the white Thunderbird, the police officers kept the motel under surveillance from about 5 a. m. until about 7:15 a. m. At that time, Russell Nebeker, a detective on the Ogden Police Department, returned to the motel a second time, entered the motel, and asked the clerk the room number of the two persons who were traveling in the white Thunderbird. The clerk told him it was No. 132, and gave him the key to such room. Nebeker was accompanied by Sergeant Reid and Detective Padelsky, who entered the room with him. They observed two twin beds in the room, and a man asleep in each of the twin beds. One of the men was Harris and the other was Burney. They were placed under arrest, permitted to dress, handcuffed, and taken into custody. Nebeker testified that Harris's clothes were partly over a chair and partly on a table immediately at the foot of the bed occupied by Harris, and that Burney's clothes were at a separate location near his bed. The evidence showed that at the time of the lineup each man was dressed in the clothes he had at the motel when placed under arrest by the officers. Since Harris was handcuffed, a gold shirt and suede jacket were draped over his shoulders.

Mrs. Christine Buchanan, the clerk at the motel, examined the picture taken at

the lineup and identified Burney as the man who registered about 1 a. m. on December 29, 1970, and was assigned to Room 132 for two persons. She said he registered under the name of Don Newman. On the registration slip, under the word "automobile" was written "T.B."

When Burney registered, he asked the clerk if his boss had been there two days before and made a reservation for himself and a Mr. Harris. Mrs. Buchanan testified that she had attended the preliminary hearing, but was not called as a witness. She testified at the trial of Harris in the state court. On cross-examination, Harris was pointed out to her, and Mrs. Buchanan testified it was not Harris who registered for Room 132 at the motel. She was shown Defendant's Exhibit No. 1, the photograph of the lineup, and she identified Number 6, who was Richard Burney, as the man who registered at the motel.

John Kinsey, a witness for the state at the state court trial of Harris, testified to these facts:

Kinsey met and became acquainted with Harris at Mike's Lounge in Salt Lake City, Utah, "somewhere around Christmastime." He met Harris again at the same lounge on December 28, 1970, at 2 p. m. and was with him until 9 p. m. of that day. Harris was accompanied by one Burney. Kinsey said he did not remember Burney's given name. They visited several lounges and played pool. They traveled from one lounge to another in a bullet-shaped white Thunderbird. It was a convertible model, 1961, 1962, or 1963. Kinsey particularly noticed black clothing hanging in the rear behind the driver's seat on the left-hand side.

Harris also wore boots and had some difficulty in getting them on at the motel. Kinsey testified that Harris was wearing cowboy boots when he was with him on December 28, 1970, in Salt Lake City.

Counsel for Harris contends that the way he was dressed at the lineup was improper and suggestive of his identity, and tainted his identification at the preliminary hearing and the trial.

Miss Edwards did not identify Harris at the lineup, although he looked familiar to her. Likewise, she did not identify him at the trial. She did identify Burney at the lineup.

In its opinion on the appeal of the state court case, State v. Harris, 26 Utah 2d 365, 489 P.2d 1008, 1010, the Supreme Court of Utah stated:

"In the instant case, the victim has never specifically identified defendant as the man but has merely testified as to the similarity of characteristics of her assailant and the defendant. * * * *"

At the trial, Miss Edwards did not identify Harris as one of her assailants. Her testimony was in the nature of comparisons. She testified that the jacket and shirt which the officers draped around Harris's shoulders when they arrested him, and which he wore at the lineup, were the same as the jacket and shirt she saw on the man when he handed her the blouse, and that the hair of the man who handed her the blouse, as to style, color and length, was the same as Harris's hair at the trial, except that at the trial his hair appeared to be a little shorter, and that the right sideburn of the man who handed her the blouse was the same as that of Harris at the trial, except it appeared to be a little shorter.

She did not testify that the man who handed her the blouse and Harris were identical. She only testified to the similarity of clothing, hair, sideburns, and texture of facial skin. That, in our opinion, is not identification in the ordinary sense of the term.

Kinsey examined the state's exhibits "D" and "E", the jacket and shirt found with Harris's clothes when he was arrested on the morning of December 29, 1970, and said they were the same suede leather jacket and solid gold shirt that Harris was wearing when he was with him and when he left him on December 28, 1970. Kinsey also examined the

state's exhibits "I" and "J", which were photographs of the Thunderbird that the police found parked in the parking lot adjacent to the motel on the morning of December 29, 1970. He said that the photographs showed some black clothes hanging in the car on the back of the driver's seat, and that he had noticed the same clothing hanging in the same location in the Thunderbird that Harris and Burney were driving when he was with them on December 28, 1970, and that the car shown in the photographs was the same car.

Miss Edwards testified that the Thunderbird the police officers found in the parking lot was the same Thunderbird in which Burney and another man transported her from her car to the motel and from the motel back to her car. She testified that on the trip back to her car her blindfold was loose and she could see by looking downward, and that she saw clothing hanging behind the driver's seat and bottles and other articles on the floor in front of the rear seat, and that she saw in the Thunderbird that the officers found parked adjacent to the motel the same clothing hanging in the same location, and the bottles and other articles on the floor in front of the rear seat.

■ We think the evidence clearly established that the clothes Harris wore in the lineup, held very shortly after he was arrested and taken to the police station, were the same clothes he was wearing when he was with Kinsey and when he left him, and that he wore such clothes continuously thereafter until he retired at a late hour on December 29, 1970, in Room 132 at the motel. If that be true, then he was wearing those clothes when the offense was committed against Miss Edwards at the motel. Solid colored shirts were not unusual in 1970, nor were suede leather jackets with a rough finish. We do not think

that under the facts and circumstances shown in this case, with respect to Harris, it was error to require him to wear the same clothes in the lineup that he was wearing when the offense was committed.[1]

Miss Edwards did think Harris looked familiar in the lineup, but not sufficiently so for her to positively identify him. Counsel for Harris concedes Miss Edwards did not identify Harris in the lineup, but asserts that she identified him at the preliminary hearing. We do not have the record of the preliminary hearing before us. The reliance of counsel for Harris on his contention that Miss Edwards identified Harris at the preliminary hearing is based on her answer to a very adroit question asked by him, as follows:

"Now, at the preliminary hearing did you make an identification *of any sort* of Mr. Harris?"

We emphasize the words, "of any sort." She answered the question in the affirmative. He then asked her:

"And how did you make that identification?"

She answered:

"What do you mean by how? How I knew, or * * * ?"

Counsel at that point interrupted her by asking another question and gave her no opportunity to explain what she meant by "identification."

There are times when the word "identify" is loosely used in the record, and since counsel for Harris interrupted Miss Edwards when she started to state how she identified Harris, we are not going to assume that she testified to more at the preliminary hearing than she did at the trial. Moreover, the important time was at the trial, not at the preliminary hearing.

We conclude, therefore, that it was not error to have Harris wear the clothes in

1. See United States v. Ball, 6 Cir., 381 F.2d 702, 703 (1967), cert. denied 390 U.S. 962, 88 S.Ct. 1066, 19 L.Ed.2d 1161; Schott v. Colorado, Colo., 482 P.2d 101, 102 (1971); People v. Floyd, 1 Cal. 3d 694, 83 Cal.Rptr. 608, 464 P.2d 64, 75–76 (1970); State v. Harris, 26 Utah 2d 365, 489 P.2d 1008, 1011 (1971).

the lineup that he had worn from the afternoon of December 28, 1970, until he retired at an early hour of the morning of December 29, 1970, and at the time when the offense was committed.

The remaining question is whether Harris was entitled to have an attorney present to advise him at the lineup. Chief Judge Ritter held that he was deprived of his right to counsel at the lineup, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

In Kirby v. Illinois, decided June 7, 1972, 406 U.S. 682, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417, the Supreme Court held:

" * * * it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. * * * "

At the time the lineup was held, Harris had not been charged by information, complaint, or any other formal accusation, and the Supreme Court in Kirby v. Illinois, supra, held that a police station lineup conducted before the defendant had been indicted or otherwise formally charged with a criminal offense, and where all the defendant was required to do was to exhibit his physical characteristics, and was not required to disclose any knowledge that he might have or provide the state with evidence of a testimonial or communicative character, was not a violation of the Sixth and Fourteenth Amendments, since adversary proceedings had not been commenced.

Accordingly, we conclude that the manner in which the police lineup was conducted, and the fact that Harris did not have counsel who was present at the lineup, did not violate any constitutional right of Harris, and that the court erred in releasing him from custody.

The cause is remanded with instructions to discharge the writ of habeas corpus and remand Harris to the custody of the appropriate Utah officials.