**UNITED STATES of America ex rel. Nicholas CONOMOS, Petitioner,**

v.

**Hon. J. Edwin LaVALLEE, Superintendent of Clinton Correctional Facility, Respondent.**

**No. 72 Civ. 2381.**

United States District Court, S. D. New York.

July 30, 1973.

996

Nicholas Conomos, pro se.

Louis J. Lefkowitz, Atty. Gen. State of New York, New York City, for respondent; Stanley L. Kantor, Deputy Asst. Atty. Gen., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, now serving a sentence of eight and one-third years to twenty-five years imposed under a judgment of conviction entered in June 1969 following a jury trial in the Supreme Court of the State of New York (Murtagh, J.) for attempted murder (two counts),[1] seeks his release upon a federal writ of habeas corpus charging various violations of his rights under the fifth, sixth and fourteenth amendments to the Federal Con-

---

1. Petitioner was also convicted of related crimes of assault in the first degree (two counts) and possession of weapons as a felony (one count) as to which lesser concurrent sentences were imposed. In addition, with respect to unrelated charges, he pled guilty to two counts of attempt to commit robbery in the first degree, as to which concurrent sentences were also imposed.

stitution. He alleges that (1) the lineup identification procedures at a stationhouse were impermissibly suggestive and conducive to irreparable misidentification and he was denied the effective assistance of counsel at the lineups, thereby requiring the exclusion of the witnesses' identification testimony at the trial; (2) the introduction in evidence of weapons which allegedly had no connection with the crime was unduly prejudicial and inflammatory; (3) the prosecutor's summation was unduly inflammatory and prejudicial and impinged upon his right to remain silent; (4) the prosecutor's remarks at the time of sentence were unfair and violated his right to due process of law; (5) the denial of his motion for a new trial without affording him an evidentiary hearing violated his right to due process of law; and (6) the denial of his petition for a writ of error coram nobis, based upon a claim that perjury was committed at his trial, without affording him a hearing also violated his right to due process.

Petitioner's judgment of conviction was affirmed by the Appellate Division, First Department, on March 2, 1971,[2] and leave to appeal was denied by the Court of Appeals on March 30, 1971. Also, the denial of his motion for a new trial was affirmed without opinion by the Appellate Division on June 8, 1971,[3] and leave to appeal to the Court of Appeals was denied on July 21, 1971. Finally, the denial of his coram nobis petition was denied review by the Appellate Division on January 6, 1972, and leave to appeal was denied by the Court of Appeals on January 26, 1972. Thus it appears that petitioner has exhausted available state remedies and the State makes no contention to the contrary.

The events which grounded the prosecution may be briefly stated. At about 8:30 a. m. on March 19, 1968, four men were seated in a red Cadillac on the south side of 24th Street, between First and Second Avenues, about 100 yards east of Second Avenue, when shots were fired into the car by two men who were outside near the passenger side of the car. Two men in the car, Luis Montalvo and Charles Rodriguez, were wounded. The event was observed by four individuals, passersby, from separate positions, each of whom identified the petitioner and Joseph Benanti, his codefendant upon the trial, as the assailants. The suspects were apprehended within minutes of the shooting, when they were taken from a bus at 23rd Street and Third Avenue into which they had fled after being pursued by one of the eye witnesses.

## THE STATIONHOUSE LINEUP

Three of these witnesses, Peter Mietencorte, Elmer M. Borsuk and Joanne Pritchett, within about seven hours after the shooting, identified petitioner in a stationhouse lineup, and a fourth, Robert Harris, about ten hours after the event, identified a photograph of petitioner out of six or seven that had been shown to him.[4]

Petitioner's first challenge to the validity of his judgment of conviction is based upon events at the lineup which were the subject of a pretrial *Wade-Gilbert-Stovall* hearing as to possible taint.[5]

---

2. 36 A.D.2d 794, 318 N.Y.S.2d 680.

3. 37 A.D.2d 527, 322 N.Y.S.2d 979 (1st Dep't).

4. Petitioner does not challenge this photographic identification as to which a *Simmons* (Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)) hearing was conducted, following which the trial judge found beyond a reasonable doubt that the identification procedure was within constitutional limits and that the in-court identification was free from taint.

5. *See* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *see also* United States ex rel. Phipps v. Follette, 428 F.2d 912, 913 n. 1 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

The hearing, conducted immediately before the trial, extended over a four-day period and was presided over by the trial judge.

The lineup, consisting of seven persons—petitioner, Benanti, a third suspect and four detectives—was held in the interrogation room of the police station. The seven men were of generally similar stature, height and weight and dressed in varying attire. There were four separate lineups in which the participants took different positions. The driver of the bus in which petitioner and Benanti were apprehended identified them as having entered the bus together. Pritchett, Borsuk and Mietencorte, each viewing a separate lineup, identified petitioner.

At the *Wade* hearing each eyewitness gave detailed testimony as to events at the time of the shooting and at the lineup. The hour of the shooting was described as clear and sunny.

Joanne Pritchett, a registered nurse employed at the Veteran Administration Hospital, located on First Avenue and 24th Street, testified that in the afternoon of the day of the shooting she received a telephone call from a detective requesting that she appear at the police precinct to look at a lineup. Upon arrival there, at about 3 o'clock, the detective escorted her to a lineup of seven men and asked if she recognized anybody she had seen earlier that day, and she identified petitioner and his codefendant as the two men who had fired into the red Cadillac. She testified that she was walking easterly on the north side of East 24th Street immediately before the shooting when she saw a red Cadillac parked across the street at the south curb about twenty yards east of where she was then walking; she also saw a blue Pontiac sedan come along and park with its motor running near the red car; two men emerged from the Pontiac and walked to the passenger side of the Cadillac and commenced firing into it, one with a pistol and the other with a long rifle. Approximately three to five shots were fired. She saw the faces of the

men as they approached the red car for about forty-five to sixty seconds and their profiles when they were in the vicinity of the car. The entire occurrence took between sixty and 120 seconds and her view was unobstructed. When she heard shots she remained in the same position, but stooped down, had an unobstructed view and saw the faces of the two men, who started to run at a jogging pace toward Second Avenue and down Second Avenue to 23rd Street, where she lost sight of them when they turned the corner on the west side. From the time the Pontiac first came upon the scene until the two men disappeared around the corner at 23rd Street, covered a period of "give and take three to five minutes."

Elmer Borsuk, another witness at the hearing, testified he was walking on the north side of 24th Street in the direction of Second Avenue when he was attracted by the sound of gunfire; that upon turning around he saw two men across the street about 120 feet away firing weapons at two other men; the two men who were firing started to run toward Second Avenue, that is, westerly, and threw their weapons, which he was under the impression were revolvers, over a fence; they ran around the corner toward 23rd Street; he followed in pursuit; the men ran into 23rd Street and continued toward Third Avenue; about the middle of the block, as he was running after them, a police car came along, which he entered, and he told the police officers he was chasing two men; he lost sight of the men momentarily; the car proceeded in the direction the men were running; he and the police officers came to a bus stop at Third Avenue and 23rd Street; he and one of the officers entered the bus, which was crowded to capacity, and he saw a man with a green sweater near the coin box whom he recognized as one of the two men who had fired the revolvers; this man's face was bloody, his lip swollen and his hand bleeding; after he identified the first man (Benanti) within seconds he identified the second man (peti-

tioner), who had been standing within inches of the first man, as the other assailant;[6] both men were removed from the bus and frisked on the sidewalk.

Borsuk further testified that at about 4 o'clock in the afternoon of the same day at the police station he was asked to view a lineup of seven men to see if he could recognize the two men he had observed that morning fire the shots and who had been taken off the bus, and that he then identified petitioner and the codefendant, as he did again at the hearing.

The third identification witness at the pretrial hearing was Peter Mietencorte. He testified that at about 8:30 a. m. on the day in question he was walking on the east side of Second Avenue when he observed a blue Pontiac car parked at the curb on the east side of Second Avenue. The man behind the wheel had on a trench coat with blood stains on the collar; his face was bruised, lips swollen, as was his hand, which was bloodied. Soon another man entered the car. The witness testified he "got a good look" at the occupants—ten or fifteen seconds, or perhaps thirty seconds. He saw the car drive around the corner easterly into East 24th Street. In the meantime the witness had crossed to the west side of Second Avenue; he heard shots and hoisted himself on a parking meter in order to see what was happening; he observed two men fire into a red car but lost sight of them momentarily; then he saw a man running toward him across Second Avenue, who came within "twenty feet of him" running as fast as he could. About one and one-half hours later he saw the latter individual at the stationhouse when he came in with someone; about two and a half hours later, while still at the stationhouse, he saw another individual whom he also recognized. Nobody directed his attention to either one, nor were they handcuffed. He recognized the individual last referred to (Benan-

ti), particularly because he had a swollen mouth, blood on his face, lacerations and his hand was bandaged. Later the witness was told to look at a lineup consisting of seven men to see if he recognized anyone. He identified Benanti as the man he had seen behind the wheel of the Pontiac at 8:30 that morning. He also identified petitioner as the man who had entered on the passenger's side and later ran across Second Avenue toward him. He further testified they were the two men he saw enter the stationhouse, as previously described.

The final witness as to identification was the bus driver, who testified he was at his seat when the bus, which was already crowded, was taking on passengers who were waiting on line; that suddenly there was some commotion and two men, who were not on line, rushed the door and boarded the bus in a hurried way; they were crowded close to him and were facing one another "belly to belly"; that in seconds an officer pushed his way in with a civilian who identified the first man (Benanti) who was facing the civilian; the second man (petitioner) had his back to the civilian, who then looked around and also identified the second man and both were taken off the bus. Later that day, in a seven-man lineup at the stationhouse, he identified two persons in the lineup as the men who were taken off the bus.

■■ This court has read the *Wade* hearing record. It presents an overwhelming case for the integrity of the identification procedure; there is no basis for any claim that any incident, or that any police officer or any other person, suggested that petitioner was a suspect as a participant in the shooting. There can be little doubt that each witness' identification of the petitioner was based upon observation of the assailants at the time of the attempted murder. Indeed, Judge Murtagh found beyond a reasonable doubt that the lineups were conducted fairly; that the identifications by the four witnesses were made

6. Borsuk admitted that he had not noticed petitioner until the bus driver pointed him out.

exclusively on the basis of their original observations; that they were in no wise tainted by the lineups, which he further found were constitutionally conducted. These findings are fully supported by the record and are entitled to great weight.[7] Despite these findings, petitioner continues to press that the events at the stationhouse, principally those preceding the lineups, should have precluded the in-court identifications of the witnesses who viewed the lineup. To determine this issue the court's inquiry must be whether (1) "the initial identification procedure was 'unnecessarily' . . . or 'impermissibly' . . . suggestive," and if so, (2) was that procedure "so 'conducive to irreparable mistaken identification' . . . that allowing the witness to make an in-court identification [was] a denial of due process."[8] The answer must be based upon the "totality of the circumstances"[9] and a negative answer to the first part of the test obviates the necessity of proceeding to the second.

Petitioner stresses that prior to the lineup, Mietencorte and Borsuk were together in the squad room at the stationhouse for several hours. Mietencorte testified that while there he saw about fifty men passing in and out of the squad room; that he saw petitioner and his codefendant enter and did not know they were in the custody of the police; he saw both before the lineup, but did not point them out to anyone and no one suggested their identity to him. Mietencorte admitted it was possible that either he or other witnesses said "that's the guy" when petitioner entered the stationhouse, but he could not recall, if it did happen, whether this was before or after the lineup—in any event, he was positive he recognized the petitioner and his codefendant upon their entry into the stationhouse. Mietencorte's immediate recognition of petitioner upon first seeing him at the stationhouse not only does not impair the validity of his later identification in the lineup, but gives strength to its reliability.[10] Petitioner further claims that Mietencorte's lineup identification was suspect because in addition to having seen petitioner and Benanti while in the squad room, he also had seen there two detectives who later were included in the lineup, both wearing jackets and neckties; however Mietencorte testified he did not know who these men were.

Borsuk testified that while in the squad room and before the lineup he talked to other witnesses, but they simply exchanged amenities; that the event that morning was the topic of conversa-

---

7. *See* United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1241–1242 (1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

8. United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); *see* Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020 (2d Cir. 1972).

9. *See* Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967); United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

10. *Cf.* Allen v. Moore, 453 F.2d 970, 974 (1st Cir.), cert. denied, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972); United States v. Seader, 440 F.2d 488, 496 (5th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 56, 30 L.Ed.2d 54 (1971); United States ex rel. Carnegie v. MacDougall, 422 F.2d 353 (2d Cir.), cert. denied, 398 U.S. 912, 90 S.Ct. 1711, 26 L.Ed.2d 74 (1970); United States v. Marson, 408 F.2d 644, 650 (4th Cir. 1968), cert. denied, 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698 (1969). Mietencorte's recognition of petitioner upon first seeing him enter the stationhouse also vitiates any claim that his later viewing of petitioner in a cell influenced his lineup identification.

tion since it was a rather unusual occurrence. However, nothing has been presented to show that any impropriety occurred prior to the lineup to suggest to either Borsuk or Mietencorte that petitioner was a suspect.

As to Joanne Pritchett, she was not in the squad room at any time; as already noted, she was called at the Veterans Hospital where she was on duty after the shooting and went directly to the lineup room.

The conduct of the lineups themselves provides no basis for a challenge to the integrity of the witnesses' identifications.[11] Pritchett, Mietencorte and Borsuk were certain in their identifications of petitioner[12] and those conducting the lineups did not give any leading or misleading instructions to the witnesses.

■ The record is most compelling that the identification procedures were free from any suggestiveness and the lineup identification of each eyewitness was based upon independent observation of what occurred earlier that morning at the shooting and immediately thereafter when each had ample opportunity to observe the assailants or the persons running from the scene of the shooting.[13] The record abundantly supports the finding of Judge Murtagh that the pretrial identifications were entirely fair; any other finding would fly in the face of overwhelming evidence. The lineups were conducted with such scrupulous fairness that they foreclose any claim they were "unnecessarily" or "impermissibly" suggestive. That there were some inconsistencies in a witness' testimony either at the pretrial hearing or upon the trial merely goes to the weight of evidence and those were matters for jury determination.

■ The petitioner makes a further claim that the identification testimony was subject to per se exclusion upon the trial because of the absence of counsel at the lineups. About an hour prior to the lineups petitioner was informed they would take place and that he had a right to have counsel present. His codefendant had the professional card of a lawyer and both requested that the lawyer be called. The detectives tried to reach the lawyer at his office, but he was out and they left word with his secretary that he call back. They waited approximately an hour but the lawyer never returned the call and the officers proceeded with the lineups. Entirely apart from the fact that there was no requirement that the police delay the lineup indefinitely when all witnesses were present to await the arrival of counsel, the fact is that petitioner was not entitled to counsel as a matter of constitutional right. No formal proceedings had been initiated,[14] no preliminary hearing[15] had been held,

11. Seven persons participated in the lineup, and the suspects were permitted to choose their own positions for each viewing. *Cf.* Monteiro v. Picard, 443 F.2d 311 (1st Cir. 1971), cert. denied, 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972). There were no material variations in the physical characteristics of the participants. *Compare* Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020 (2d Cir. 1972); United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317, 1329 (1971), cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). Additionally, a photographic record, albeit a somewhat questionable one since the photos were of a restaging, was kept by the police. *See* United States v. Hamilton, 137 U.S.App.D.C. 89,

420 F.2d 1292, 1295 (1969). On lineup standards in general see N. Sobel, Eye-Witness Identification: Legal and Practical Problems (1972).

12. The fact that some witnesses may have taken as long as four or five minutes to' make the identification can be interpreted as concern to make an accurate identification, not necessarily as uncertainty.

13. *Cf.* United States ex rel. Robinson v. Zelker, 468 F.2d 159, 163–164 (2d Cir. 1972), cert. denied, Zelker v. Robinson, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed. 2d 401 (1973); United States ex rel. Bisordi v. LaVallee, 461 F.2d 1020, 1024–1025 (2d Cir. 1972).

14. *Cf.* Harris v. Turner, 466 F.2d 1319 (10th Cir. 1972).

15. *Cf.* United States v. Coades, 468 F.2d 1061 (3d Cir. 1972).

no warrant had been issued.[16] In the circumstances, the presence of counsel at the stationhouse lineups was not constitutionally mandated. The matter has been set at rest by the Supreme Court in Kirby v. Illinois,[17] which rejected application of a per se exclusionary rule to trial testimony of lineup identifications solely because of the absence of counsel at a lineup which was conducted during an investigatory stage and preceding the initial adversary criminal proceeding.[18]

■■ Petitioner's next challenge to the judgment of conviction centers about incidents at the trial and the introduction in evidence of (1) two pistols; (2) shotgun shells and bullets; (3) an automatic pistol holster; and (4) a shotgun sleeve. These were found upon a search of the red Cadillac, of which Rodriguez, one of the victims, was the driver. Codefendant Benanti's counsel, in his opening, had suggested a claim of self defense on behalf of Benanti, who "himself was a victim and was shot in the course of this occurrence,"[19] and the court admitted the evidence as part of "the total picture," noting "the possibility of self defense."[20] The admission of the exhibits in evidence was proper; but even if it were error, this by itself does not permit a federal court to void a state court conviction. The court may do so only when the wrong complained of deprived a defendant of a fundamentally fair trial.[21] The introduction in evidence of the pistols and other items was of little consequence. The prosecution made no claim they belonged to petitioner or his codefendant; to the contrary, Rodriguez, called as a prosecution witness, identified some of the items as his own. Under the circumstances, there is a complete absence of showing of conspicuous prejudice, if indeed any prejudice, so as to result in a denial of a fundamentally fair trial within the meaning of the due process clause.[22]

■ Equally without substance is petitioner's claim with respect to the prosecutor's summation. He challenges three portions thereof as unduly unfair: (1) references to a fight at an after-hours club prior to the shooting; (2) an attack on the credibility of codefendant Benanti, who testified, and an alleged intimation that both defendants had caused Rodriguez to testify falsely in their favor; and (3) alleged comments upon petitioner's failure to testify.

Each claim readily dissolves upon analysis and reference to the record. The comments on the fight at the club were fully justified to establish a motive

16. *See* United State ex rel. Robinson v. Zelker, 468 F.2d 159 (2d Cir. 1972), cert. denied, Zelker v. Robinson, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973).

17. 406 U.S. 682, 92 S.Ct. 1877, 32 L. Ed.2d 411 (1972).

18. *See* Royce v. Moore, 469 F.2d 808, 812 'n. 5 (1st Cir. 1972); United States v. Coades, 468 F.2d 1061 (3d Cir. 1972); United States v. Smith, 467 F.2d 1126, 1131 (7th Cir. 1972); Harris v. Turner, 466 F.2d 1319, 1325 (10th Cir. 1972); United States v. Bothwell, 465 F.2d 217, 218 (9th Cir. 1972). The decision in Saltys v. Adams, 465 F.2d 1023 (2d Cir. 1972) (Friendly, C. J., dissenting), does not require a result different from the one reached by this court.

19. TM at 44. TM refers to the trial minutes and SM refers to the sentencing minutes.

20. TM at 575.

21. United States ex rel. Cannon v. Maroney, 373 F.2d 908, 910 (3d Cir. 1967); United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966); United States ex rel. Birch v. Fay, 190 F.Supp. 105, 107 (S.D.N.Y.1961); *cf.* Corpus v. Beto, 469 F.2d 953, 956 (5th Cir. 1972).

22. *See* United States ex rel. Watson v. Yeager, 458 F.2d 23 (3d Cir. 1972); United States ex rel. Mintzer v. Dros, 403 F.2d 42 (2d Cir. 1967), cert. denied, 390 U.S. 1044, 88 S.Ct. 1643, 20 L.Ed.2d 305 (1968); United States ex rel. Castillo v. Fay, 350 F.2d 400 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966); United States ex rel. Birch v. Fay, 190 F.Supp. 105 (S.D.N.Y.1961); *see also* United States v. Lewis, 140 U.S.App. D.C. 345, 435 F.2d 417, 420–421 (1970).

for the shooting. The testimony of witnesses permitted argument based upon circumstantial evidence that Benanti and Conomos had been hurt in a fight with Rodriguez and one Dino Berberian (also an occupant in the red car at the time of the shooting) in an after-hours club and were bent upon revenge. Soon after the fight Benanti was nursing a bruised hand and lip (he was so identified by several of the witnesses) and just before the shooting Benanti talked with Conomos about "getting him." The record justified an attack by the prosecutor upon the credibility of both Benanti, who as a defendant obviously had a motive to fabricate,[23] and his friend Rodriguez, who, called as a state witness primarily to establish the fact of his wounds, suffered a "lapse of memory" and denied he had seen Benanti either in the after-hours club or at the scene of the shooting, a matter referred to hereafter with respect to petitioner's claim on the denial of his motion for a new trial.

The prosecutor did not charge or intimate that it was the defendants who caused Rodriguez to testify falsely in their favor. He did argue, and properly so, to the jury that Rodriguez's failure to place Benanti, whom he knew, at the scene of the shooting when other eyewitnesses, strangers to those engaged in the fracas, were unequivocal in their identification of the defendants as the assailants was explained by Rodriguez's friendship for Benanti. Indeed, that Benanti himself testified he and Conomos were at the scene of the shooting readily dispels any claim that the prosecutor urged upon the jury they were responsible for Rodriguez's testimony on this subject.

■ Finally, petitioner seeks to read into the prosecutor's remarks a comment on his failure to take the witness stand, but the record simply does not support the charge. He relies principally upon this statement:

> "Now, Mr. Evseroff [Benanti's counsel] pointed out to you that when he sat down that would be the last you would hear from him because the district attorney speaks last. That is true, but you also will remember that before the defendant if he chooses utters a word of testimony he is able to sit in his chair and listen to the People's entire case before he has to utter a word if he chooses to." [24]

The petitioner stresses that the phrase "if he chooses to" used twice was a reference to, and conveyed to the jury, his failure to testify. The claim is far fetched; it disregards the totality of the statement which was an exposition to the jury of the balanced procedure of the trial, with the prosecution called upon to present his entire case with the defendant listening to it before deciding upon his course of action. It was a proper reply to defense counsel's argument and to put the order of trial in proper context. Not only is petitioner's claim far fetched, but it is highly improbable that the jury would have attached the connotation which petitioner now attributes to the remarks.[25] That they were not of significance is perhaps best attested to by the fact that petitioner's experienced trial counsel, despite numerous subsequent interruptions, never objected to this part of the summation, which alone forecloses consideration of his claim.[26]

■ In sum, none of the above alleged errors, assuming arguendo they are in fact errors, is of substance and, either singly or in totality were of such a nature that petitioner was deprived of

23. *See generally* Reagan v. United States, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895); Nelson v. United States, 415 F.2d 483, 487 (5th Cir. 1969), cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970); 3A J. Wigmore, Evidence § 968 (Chadbourn rev. 1970).

24. TM at 1202.

25. *Cf.* United States ex rel. Satz v. Mancusi, 414 F.2d 90 (2d Cir. 1969).

26. *See* United States ex rel. Satz v. Mancusi, 414 F.2d 90, 92 (2d Cir. 1969); United States v. Nasta, 398 F.2d 283, 285 (2d Cir. 1968).

a fundamentally fair trial. They do not raise a due process question.[27]

Petitioner's next contention merits little consideration since it does not affect, even if sustained, the validity of the trial and the judgment of conviction. His claim here is that at the time of sentencing the prosecutor made prejudicial statements with reference to: (1) the killing of Berberian, a key witness to the crime, intimating the defendants were responsible; (2) perjury by several witnesses, which he "ascribe[d]" to petitioner and his codefendant; and (3) petitioner's connection with organized crime. The petitioner had a sordid criminal record which was referred to during the course of the sentencing. Additionally, before the sentencing he pleaded guilty to two separate charges of attempted robbery in the first degree, neither of which was related to his conviction for attempted murder in the instant case. The short answer to petitioner's allegation of prejudicial reference by the prosecutor is that the court had before it a "full probation report." [28] The court noted that the defendants' extensive felony records made them eligible to imprisonment for life, and although he had some inclination to adopt that approach since it appeared they were both "wedded to a life of crime and violence . . . characterized by the use of deadly weapons," instead he would temper the sentence to some degree.[29] In the light of all the facts, it borders on the absurd to contend that the prosecutor's remarks, hard-hitting as they were, made in response to defense counsel's plea of leniency, resulted in the denial of due process in the court's imposition of sentence upon petitioner.

Petitioner next contends that denial of his motion for a new trial upon a claim of newly discovered evidence without affording him an evidentiary hearing was a denial of due process. It is hornbook law that not every motion for a new trial requires a hearing; that a motion for a new trial should be granted with great caution and is addressed to the court's discretion. The same standard applies in the federal [30] and state courts.[31] Petitioner's motion for a new trial adopted a similar one made by his codefendant

---

27. See United States ex rel. Castillo v. Fay, 350 F.2d 400, 401 (2d Cir. 1965), cert. denied, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966) ; Chavez v. Dickson, 280 F.2d 727, 735 (9th Cir. 1960), cert. denied, 364 U.S. 934, 81 S.Ct. 379, 5 L.Ed.2d 366 (1961) ; cf. Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943) ; United States ex rel. Haynes v. McKendrick, 350 F.Supp. 990, 996–997 (S.D.N.Y.1972), aff'd, 481 F.2d 152 (2d Cir. 1973).

Additionally, the evidence against the petitioner was so overwhelming, that this court has "no reasonable doubt that the jury at petitioner's . . . trial would have reached the same verdict" even had it not heard the prosecutor's alleged prejudicial statements or not viewed the items received in evidence. Milton v. Wainwright, 407 U.S. 371, 377, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) ; see Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) ; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) ; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

28. SM at 7, 9, 26. Compare Horner v. Florida, 312 F.Supp. 1292, 1295 (M.D. Fla.1967), aff'd, 398 F.2d 880 (5th Cir. 1968) ; United States ex rel. Jackson v. Myers, 374 F.2d 707 (3d Cir. 1967).

29. SM at 27.

30. See United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973) ; United States v. Dara, 429 F.2d 513 (5th Cir. 1970) ; cf. United States v. Birnbaum, 421 F.2d 993 (2d Cir.), cert. denied, 397 U.S. 1044, 90 S.Ct. 1363, 25 L.Ed.2d 655 (1970).

31. See People v. Salemi, 309 N.Y. 208, 215, 128 N.E.2d 377 (1955), cert. denied, 350 U.S. 950, 76 S.Ct. 325, 100 L.Ed. 827 (1956) ; People v. Patrick, 182 N. Y. 131, 178, 74 N.E. 843 (1905), appeal dismissed, 203 U.S. 602, 27 S.Ct. 783, 51 L.Ed. 335 (1906) ; People v. Watford, 19 A.D.2d 731, 242 N.Y.S.2d 369, 371 (2d Dep't 1963) ; People v. Lesser, 280 App.Div. 441, 113 N.Y.S.2d 558, 559 (1st Dep't 1952), aff'd, 304 N.Y. 903, 110 N.E.2d 734, cert. denied, 346 U.S. 840, 74 S.Ct. 65, 98 L.Ed. 361 (1953).

based upon an affidavit by Rodriguez, who it will be recalled testified upon the trial that he did not observe the men who did the shooting. Rodriguez, in the affidavit submitted in support of the motion, now swore he knew "for a fact that the people shooting at us were not Joseph Benanti and Nicholas Conomos since they were friends of mine and I am certain I would have recognized them if they were the ones that were doing the shooting." Obviously this is not newly discovered evidence; [32] Rodriguez, as a trial witness, was subject to cross-examination on his relationship to the defendants; and indeed the prosecutor, as previously noted, contended Rodriguez had a convenient memory and was a pliable witness in an effort to help his friends and was now engaged in the same effort, which was obvious to the trial court, as it is to one reading this record. Rodriguez's affidavit, in the light of his trial testimony, upon its face was unbelievable. Moreover, the trial court found that the motion failed to meet the requirements of section 465(7) of the Code of Criminal Procedure,[33] including that it appear, if Rodriguez had so testified upon the trial, it would probably have resulted in a change of verdict. That petitioner was not accorded a hearing on his motion for a new trial presents no issue of federal constitutional dimensions.

 Finally, petitioner urges that the denial without a hearing of his motion for a writ of error coram nobis upon allegations that perjury was committed at his trial by a prosecution witness violated his right to due process of law. The alleged perjury is attributed to a detective who was asked if his efforts to locate Robert Berberian were "successful or unsuccessful," to which the witness responded "unsuccessful." The claim appears to be that the prosecution, by asking the question, knowingly caused the witness to testify falsely, since it was known to the witness and the prosecutor that Berberian had previously been murdered. It is somewhat difficult to fathom petitioner's claim of perjury, but it appears he contends that by the answer of "unsuccessful" it was the intent of the prosecutor "to create an aura in the jury's mind on the reasons Det[ective] Figueroa [the witness testifying] could not find nor produce the witness, [and that] it can be safely assumed this goal was obtained." [34]

Even accepting this contention, petitioner does not explain why a hearing was necessary as to facts not in issue—that is, the answer Figueroa gave and that indeed Berberian had been murdered. The only issue was whether the answer was perjurious and whether the prosecutor knowingly elicited it. It is clear the answer was not perjurious; [35] if anything, the answer served to keep from the jury that Berberian had been murdered, information that could have been prejudicial to the defense. Moreover, this motion was governed by the New York Criminal Procedure Law,[36] and the

---

32. *Cf.* People v. Salemi, 309 N.Y. 208, 215–216, 221, 128 N.E.2d 377 (1955), cert. denied, 350 U.S. 950, 76 S.Ct. 325, 100 L.Ed. 827 (1956); People v. Eng Hing, 212 N.Y. 373, 386, 106 N.E. 96 (1914).

33. N.Y.Code Crim.Proc. § 465(7) (McKinney 1958) (repealed, effective Sept. 1, 1971):
 "Where it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as, if before received, would probably have changed the verdict [the court has the power to grant a new trial]; if such evidence has been discovered since the trial, is not cumulative; and the

failure to produce it on trial was not owing to want of diligence. . . . "
*Compare* United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); United States v. Sposato, 446 F.2d 779, 781 n. 7 (2d Cir. 1971); United States v. Desapio, 435 F.2d 272, 286 & n. 14 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

34. Petition at 49.

35. *See* Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973); N.Y.Penal Law § 210.00(5) (McKinney's Consol.Laws, c. 40, 1967).

36. §§ 440.10, 440.30 (McKinney 1971).

asserted claim could have been raised on direct appeal.[37] The petitioner knew of Berberian's death before the trial. There was no reason to hold a hearing as to matters not in dispute [38] and there is no substance to the contention that a denial of a hearing deprived him of his right to due process of law.

This court perforce, in the light of the freewheeling charges made by petitioner, has read the entire record of the proceedings in the state court and has concluded that petitioner's claims of infringement of his constitutional rights are without factual substance—the petitioner was deprived of no constitutional right either pretrial, at the trial, or in the posttrial proceedings.

The petition is dismissed upon the merits.

---

37. *See id.* §§ 440.10(2)(c), 440.30(2); *see also id.* § 440.30(4).

38. *Cf.* People v. Tomaselli, 7 N.Y.2d 350, 356, 197 N.Y.S.2d 697, 165 N.E.2d 551 (1960); People v. White, 309 N.Y. 636, 641, 132 N.E.2d 880, cert. denied, 352 U.S. 849, 77 S.Ct. 69, 1 L.Ed.2d 60 (1956); People v. Robinson, 38 A.D.2d 821, 329 N.Y.S.2d 257 (1st Dep't 1972).